NORTH AMERICAN EXPOSITIONS COMPANY LIMITED PARTNER-
SHIP & others[1] *vs.* JOSEPH J. CORCORAN, JR., & others.[2]

No. 06-P-440.

Suffolk. February 12, 2007. - October 5, 2007.

Present: LENK, GRASSO, & GRAINGER, JJ.

Further appellate review granted, 450 Mass. 1104 (2007).

*"Anti-SLAPP" Statute.*

Discussion of the "anti-SLAPP" statute, G. L. c. 231, § 59H, and the standards
    for prevailing on a special motion to dismiss pursuant to that statute.
    [417-418]
A Superior Court judge erred in granting the defendants' special motion to
    dismiss a civil action pursuant to the "anti-SLAPP" statute, G. L. c. 231,
    § 59H, where the defendants did not meet their burden of demonstrating
    that the plaintiffs' complaint was based solely on the defendants' petition-
    ing activity, in that the challenged statements made by the defendants'
    representative (who was also a named defendant) to members of a statutorily
    created charitable foundation were not statements before a legislative body,
    executive body, or public forum [418-419]; where the representative's
    statements, which plainly had a commercial purpose and only tangentially
    discussed pending legislation, did not constitute statements made "in con-
    nection with" an issue under review by a legislative body [419-422]; and
    where the statements did not otherwise fall within the protective ambit of
    the statute [422].

CIVIL ACTION commenced in the Superior Court Department on
June 30, 2005.

A special motion to dismiss was heard by *Allan van Gestel, J.*

*Howard M. Cooper* (*Juliet A. Davison* with him) for the
plaintiffs.

*Robert E. McLaughlin, Sr.* (*Michael Eby & Richard D. Vet-
stein* with him) for the defendants.

---

[1]Joseph B. O'Neal, Mary E. O'Neal, Kathleen A. McAlpine, Brenda J.
Stafford, and Christine M. Forcier, as they are general partners of North
American Expositions Company Limited Partnership.

[2]Hub Expo Management, LLC; Bayside Associates Limited Partnership;
Bayside Expo Center, Inc., in its corporate capacity and as it is general partner
of Bayside Associates, LP; and Corcoran, Mullins, Jennison, Inc.

LENK, J. At issue is whether the defendants engaged in petitioning activity within the meaning of G. L. c. 231, § 59H (the "anti-SLAPP"[3] statute), when their representative made certain statements on two occasions to members of a statutorily created charitable foundation. The plaintiffs filed a multiple count complaint against the defendants arising out of this challenged activity, which the plaintiffs claim unlawfully interfered with ongoing business dealings between the plaintiffs and the foundation. The defendants then filed a special motion to dismiss under the anti-SLAPP statute, which a judge in the Superior Court allowed. Concluding that the defendants' activities at issue do not fall within the protective ambit of the statute, we reverse.

*Facts.* We draw the background facts of the case from the pleadings and affidavits pertinent to the special motion to dismiss, as well as from the judge's decision and order. Unless otherwise noted, the facts recited are not in dispute.

Plaintiff North American Expositions Company Limited Partnership (North American) produces and operates numerous "gate shows," such as the New England Boat Show, the New England Camping and Recreational Vehicle Show, and the North American Expositions Home Show. In contrast to conventions and trade shows, gate shows attract local attendees who typically either drive or take public transportation, attend for one day, and then go home. Conventions, on the other hand, attract out-of-town attendees who occupy local hotels and patronize local restaurants.[4] North American for many years produced its shows at the Bayside Exposition Center (BEC). Beginning in about 1999, the relationship between North American and the defendants (collectively Bayside), such as it was, soured considerably. Bayside refused to extend North American's expiring licenses to produce its shows at the BEC and actively sought other gate show sponsors. In 2001, North American initiated litigation against Bayside that settled in a manner extending North American's license for the two largest shows until 2006, and for three others until 2003.

---

[3]SLAPP is an acronym for "strategic litigation against public participation." *Cadle Co.* v. *Schlichtmann*, 448 Mass. 242, 242 n.2 (2007).

[4]This distinction is known as "heads on beds" as opposed to "cars in lots."

In light of the considerable preparation time required for gate shows[5] and the unavailability of other venues, North American found itself scrambling for alternative facilities. Faced with possible extinction, in 2001, North American made overtures to the Massachusetts Convention Center Authority (MCCA), the entity responsible for the Boston Convention and Exposition Center (BCEC), newly constructed pursuant to St. 1997, c. 152 (the Act).[6]

The process resulting in the approval and construction of the BCEC was fraught with competing political considerations and the perhaps inevitable quid pro quos. Of particular importance for this case was the Legislature's concession to the South Boston section of Boston for any inconvenience and displacement occasioned by the construction. Specifically, the Act provided for a charitable foundation, the South Boston Community Development Foundation (Foundation),[7] designed principally, if not solely, to sponsor charitable events at the BCEC, the proceeds of which would constitute the Community Development Fund held in a Massachusetts charitable trust and distributed by the Foundation for the benefit of South Boston residential, charitable, and business communities adversely impacted by the project. While § 15(d)[8] of the Act specifically prohibited the BCEC from holding gate shows, § 4(g)(ii) contained a limited

---

[5]It typically takes about two years to line up participants for these shows; the producer and sponsor, therefore, need to know well in advance the relevant dates and venues for each one.

[6]MCCA at that time responded that the Act prohibited the BCEC from booking public gate shows and thus rejected North American's overtures.

[7]The Foundation "consist[s] of a committee of nine members: three members appointed by the governor who shall be business owners from the locally impacted neighborhood; three members appointed by the mayor who shall be representatives of social service agencies; the senator from the first Suffolk district or his designee, who shall be a non-voting member, the representative from the fourth Suffolk district or his designee, who shall be a non-voting member; and the Boston city councilor from District two or his designee; all of whom, with the exception of the elected officials, shall be residents of South Boston and shall serve a two year term which may be extended by reappointment." St. 1997, c. 152, § 4(g)(i).

[8]Section 15(d) of the Act initially provided that "[n]otwithstanding any provision of this act to the contrary, the project, as defined in section 2, shall not be marketed or utilized for so-called gate shows or other similar consumer shows." Section 15(d) was amended in 2006. See discussion *infra.*

exception. The relevant exception, as initially in effect, provided as follows:

> "Notwithstanding the prohibition against gate shows in subsection (d) of section 15, in consideration of the project's impact, the Authority shall allow the South Boston Community Development Foundation to sponsor no less than three charitable events annually at the Boston Convention and Exhibition Center, and shall include access to on site parking facilities. Said events shall be scheduled mutually by the Authority and the foundation so as not to conflict or interfere with the regular operation of the Boston convention and exhibition center. Said community events shall not compete with the Boston exhibition and convention center and shall not solicit any event previously hosted by the Hynes convention center, the World Trade Center or the Bayside Exhibition Center in the ten year period before the effective date of this act, without the consent of the affected facility. Said events shall be sponsored by the foundation for the purposes set forth in this subsection; provided, further, that the net proceeds of said events shall not be used for any purpose other than those described in this subsection. The Authority shall deposit said proceeds, including, but not limited to, on site parking fees in the Community Development Fund."[9]

The controversy before us has much of its genesis in the parties' decidedly different views of what this provision meant. Bayside has consistently contended that the exception set forth in § 4(g)(ii) applied only to "charitable" or "community" events, and not to gate shows. North American, on the other hand, maintained that the provision permitted the Foundation to sponsor gate shows. Because of the result we reach, we need not resolve the controversy over the meaning of this less-than-clear language.

North American's initial overtures to the Foundation reportedly met with much enthusiasm. According to North American, however, when Bayside got wind of the possibility that North American could find a venue for its shows, thus competing with those Bayside intended to produce, Bayside "intensified its pattern of tortious interference."

---

[9]This section was also amended in 2006. See St. 2006, c. 256, § 2.

The record indicates that in January, 2005, certain members of the Foundation contacted defendant Joseph J. Corcoran, Jr., the principal of Hub Expo Management LLC and Bayside's representative, and requested a meeting. The first of two such meetings took place at Boston City Hall on February 1, 2005, and a second on March 8, 2005, at Mul's Diner in the South Boston section of Boston.[10] According to Corcoran's affidavit, the Foundation was considering sponsoring gate shows three times a year, as the Foundation's representatives believed the existing legislation permitted them to do; they wanted Corcoran's interpretation of § 4(g)(ii). Corcoran told them that he understood the provision as limiting the Foundation's sponsorship to charitable events, excluding private, for-profit gate shows. While the Foundation's representatives understandably wanted to increase revenue by holding gate shows, Corcoran stated that he did not agree with their interpretation of § 4(g)(ii). He emphasized the devastating financial impact on the BEC should the Foundation compete in this area and told the representatives that he would help the Foundation find and run charitable events.[11]

At issue during the second meeting were two competing boat shows, one that the Foundation was considering sponsoring and the other that Bayside intended to produce. The Foundation representatives reiterated their desire to have gate shows and, after discussing possible charitable events that Bayside could help them find, said that they did not want "crumbs." One member told Corcoran that proposed legislation, House Bill No. 4153,[12] would take away Bayside's monopoly and that, although Corcoran "was in the cat bird seat" at the time, he could lose everything. According to Corcoran, the meeting ended with the parties agreeing to "continue to talk to see if there was anything we could do that would enable Bayside to give its consent to the Foundation to conduct gate shows other than charitable

[10]Foundation members present at the both meetings were Joe Nee, Paul Mustone, Allison Dresher (all appointed by the Governor), and Jim Kelly, then current South Boston ward city councillor; none was a member of the Legislature.

[11]The BCEC had already begun to host the trade shows that had previously been held at the BEC, thus depriving Bayside of a significant source of revenue.

[12]On November 9, 2005, House Bill No. 4153 was replaced with House Bill No. 4493, which was signed by the Governor on August 10, 2006. See discussion *infra*.

events. I told them I did not think that was the law: that they could not conduct gate shows. I later found out that [North American] was negotiating with them for a boat show at the BCEC."

North American asserts, and Bayside denies, that Corcoran threatened to withhold consent and to sue should the Foundation sponsor gate shows. Faced with possible legal action from Bayside, the Foundation, according to North American, backed away from any plans to allow North American to produce gate shows at the BCEC.

In 2004, almost a year before the meetings between Corcoran and the Foundation members took place, an amendment to the Act was proposed that would have opened the BCEC to gate shows in excess of 300,000 square feet; this amendment was defeated by voice vote on April 27, 2004. In December, 2004, a second amendment to the Act was filed (House Bill No. 4153) that would have permitted gate shows to be held at the BCEC if they had previously been produced at a private facility and the owner of such private facility had refused to renew the agreement. Both North American and Bayside lobbied for their respective positions on the proposed legislation. This second amendment did not pass. On August 10, 2006, more than a year after North American brought the lawsuit before us, § 15(d) of the Act was amended by St. 2006, c. 256 (House Bill No. 4493), allowing gate shows at the BCEC "if each gate show uses 250,000 gross square feet or more of the [BCEC's] exhibition space." St. 2006, c. 156, § 5(d).

On June 30, 2005, North American filed its verified complaint in five counts. Count I requests preliminary and permanent injunctive relief restraining Bayside from interfering with its advantageous relationship with the Foundation; count II seeks a judgment declaring that any nonsolicitation clause in the Act does not apply in the circumstances here; count III alleges tortious interference with prospective business advantage; count IV alleges breach of the covenant of good faith and fair dealing; and count V alleges a violation of G. L. c. 93A, §§ 2 and 11.

North American's motion for a preliminary injunction was denied, and Bayside subsequently filed its special motion to dismiss under G. L. c. 231, § 59H, which the judge allowed. The

judge thereafter awarded Bayside $80,150.04 in attorney's fees and costs.

*Discussion.* We review the judge's decision allowing Bayside's special motion to dismiss for abuse of discretion or other error of law. *Baker* v. *Parsons*, 434 Mass. 543, 550 (2001) (*Baker*). *Fisher* v. *Lint*, 69 Mass. App. Ct. 360, 363 (2007) (*Fisher*). We conclude that because Bayside did not meet its burden of demonstrating that North American's complaint was based solely on Bayside's petitioning activity, it was error to grant Bayside's special motion to dismiss.

1. *The anti-SLAPP statute.* The anti-SLAPP statute is directed at " 'meritless' suits that use litigation to 'intimidate opponents' exercise of rights of petitioning and speech.' " *Vittands* v. *Sudduth*, 49 Mass. App. Ct. 401, 413 (2000) (*Vittands*), quoting from *Duracraft Corp.* v. *Holmes Prod. Corp.*, 427 Mass. 156, 161 (1998) (*Duracraft*). The statute "walks an uneasy line between protecting the right of citizens to petition government for redress of grievances and preserving the longstanding common-law right of individuals to seek redress in court for defamation and other civil wrongs." *Kalter* v. *Wood*, 67 Mass. App. Ct. 584, 591 (2006) (*Kalter*).[13] General Laws c. 231, § 59H, inserted by St. 1994, c. 283, § 1, states in pertinent part that "[i]n any case in which a party asserts that the civil claims, counterclaims, or cross claims against said party are based on said party's exercise of its right of petition under the constitution of the United States or of the commonwealth, said party may bring a special motion to dismiss." The Legislature thereby "provided a means through which persons who have been made the subject of civil litigation in retaliation for the exercise of their right to petition may be spared the expense and the burden of defense of the action." *Fisher, supra* at 362.

To prevail on a special motion to dismiss, the moving party "must make a threshold showing through the pleadings and affidavits that the claims against it are based on the petitioning activities alone and have no substantial basis other than or in

---

[13]A petition for further appellate review was granted in *Kalter*. 447 Mass. 1113 (2006). Before the case was considered by the Supreme Judicial Court, the parties filed a stipulation of dismissal, and the case, therefore, has been dismissed by the Supreme Judicial Court. SJC No. 09900 (June 27, 2007).

addition to the petitioning activities." *Vittands, supra* at 414.[14] Petitioning activities are defined in G. L. c. 231, § 59H, as "[1] any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; [2] any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; [3] any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body or any other governmental proceeding; [4] any statement reasonably likely to enlist public participation in an effort to effect such consideration; or [5] any other statement falling within constitutional protection of the right to petition government." G. L. c. 231, § 59H.

The judge, relying on the first statutory definition, concluded that the Foundation fell "within the ambit of the 'legislative, judicial, and administrative bodies and . . . other public fora' that are essential to the democratic process targeted by the anti-SLAPP statute. *Duracraft, supra* at 161 (quoting from the preamble to 1994 House Doc. No. 1520)." Thus, the judge reasoned, Corcoran's statements to its members were protected under the statute. While Bayside maintains that the judge was correct in so concluding, it relies as well on the second, third, and fifth definitions set forth in the statute. We consider each argument.

*2. The Foundation as a legislative body, executive body, or public forum.* Case law has identified the following as legislative or executive bodies:[15] the Federal Deposit Insurance Corporation, see *Office One, Inc.* v. *Lopez,* 437 Mass. 113, 123 n.15 (2002) (*Office One*); a division of the Massachusetts division of fisheries and wildlife, see *Baker, supra* at 545; and the Board of

---

[14]Once the special movant meets this burden, the burden then shifts to the nonmoving party to show that (1) the moving party's petitioning activity was without any reasonable factual support or basis in law, and (2) the activity caused actual harm to the responding party. *McLarnon* v. *Jokisch,* 431 Mass. 343, 348-349 (2000). *Baker, supra* at 551-552. We conclude that the burden did not shift to the nonmoving party in this case.

[15]Neither party argues that the Foundation could come within the statutory designation of a "judicial body."

Registration in Medicine, see *Kobrin* v. *Gastfriend*, 443 Mass. 327, 335 (2005) (*Kobrin*).

The Foundation, although statutorily created, is not a legislative body and does not act "in the name of, or on behalf of" the Legislature. See *Office One, supra* at 123 n.15. It is also not an executive body. It is, instead, a charitable foundation whose sole purpose is to dispense proceeds from various charitable events to the local community, and all of its activities are undertaken on behalf of that community. What matters, in defining a charitable organization, "is how the organization describes itself, and what in fact it does." *H-C Health Servs., Inc.* v. *Assessors of S. Hadley*, 42 Mass. App. Ct. 596, 599 (1997). The expressed purpose of the Foundation is to distribute the Fund "for the benefit of the South Boston residential, charitable and business communities which may be adversely affected by the project." St. 1997, c. 152, § 4(g)(iv). See *Western Mass. Lifecare Corp.* v. *Assessors of Springfield*, 434 Mass. 96, 104 (2001), quoting from *New England Legal Foundation* v. *Boston*, 423 Mass. 602, 612 (1996) ("[w]hile there is no 'precise number' of persons who must be served in order for an organization to claim charitable status, and 'at any given moment an organization may serve only a relatively small number of persons,' membership in the class served must be 'fluid' and must be 'drawn from a large segment of society or all walks of life' ").

Nor can the Foundation be considered a public forum. There is no indication that it has functioned at any time in a manner involving public participation, and both meetings that took place between Corcoran and the Foundation members were privately arranged and privately held. Compare *MacDonald* v. *Paton*, 57 Mass. App. Ct. 290, 295 (2003) (postings on public Web site designed as "interactive forum" on issues related to town governance served as technological version of town meeting, "a space where concerned individuals could come together to share information, express political opinions, and rally on town issues of concern to the community"). There is also no indication that the Foundation is or could be considered a governmental body subject to G. L. c. 39, § 23B, the open meeting law.

3. *Statements made "in connection with" an issue under*

*review.* Bayside contends that Corcoran's statements to a subset of the Foundation's members qualified as "any written or oral statement made in connection with an issue under consideration or review by a legislative . . . body . . . ." G. L. c. 231, § 59H.[16] This is so, Bayside's argument goes, because the statements were made in the context of a highly charged political dispute, i.e., the expansion of the use of the BCEC to include gate shows, and the controversial amendment to the Act, House Bill No. 4153, then pending before the Legislature. These are, Bayside contends, precisely the kind of petitioning activities that the anti-SLAPP statute was designed to protect. The argument, however, does not withstand scrutiny.

Bayside is "required to demonstrate that the statements relied on by the plaintiff constituted an exercise of [his] right to petition under the United States or Massachusetts Constitution." *Wynne v. Creigle,* 63 Mass. App. Ct. 246, 253 (2005) (*Wynne*). The right to petition includes "reporting violations of law, writing to government officials, attending public hearings, testifying before government bodies, circulating petitions for signature, lobbying for legislation, campaigning in initiative or referendum elections, filing agency protests or appeals, being parties in law-reform lawsuits, and engaging in peaceful boycotts and demonstrations." *Cadle Co. v. Schlichtmann,* 448 Mass. 242, 248 (2007) (*Cadle*), quoting from *Duracraft, supra* at 161-162. The central inquiry is whether the communication "had the potential or intent to redress a grievance, or directly or indirectly to influence, inform, or bring about governmental consideration of the issue." *Global NAPs, Inc. v. Verizon New England, Inc.,* 63 Mass. App. Ct. 600, 607 (2005) (*Global*). See *Kobrin, supra* at 337 (statute designed to protect citizens seeking governmental relief).

The phrase "in connection with" is not to be read as expansively as Bayside urges. "[T]he sweep of 'in connection with' is limited because the phrase pertains to statements made

---

[16]Bayside submits that the arguments that support its contention that Corcoran's statements were made "in connection with" an issue under review also qualify the statements for protection under the third definition, "any statement reasonably likely to encourage consideration or review of an issue." We therefore consider the arguments together.

to influence, inform, or at the very least, reach governmental bodies — either directly or indirectly." *Global, supra* at 605. Were we to adopt Bayside's reading, "any statement about an issue under some form of government consideration . . . would be protected by the statute." *Id.* at 604. This result, however, is outside the letter and the purpose of G. L. c. 231, § 59H.

The fatal flaw in Bayside's argument in this regard is that it has not presented any evidence that Corcoran's statements had the potential to redress any grievance or to influence any governmental body. *Garabedian* v. *Westland,* 59 Mass. App. Ct. 427, 433 (2003). It is undisputed that the proposed amendment to the Act was hotly debated in and heavily lobbied before the Legislature, but even if "a statement concerns a topic that has attracted governmental attention, [that,] in itself, does not give that statement the character contemplated by the statute." *Global, supra* at 605.

Nor do Corcoran's statements qualify as "mirror images" of other protected statements made in the course of petitioning activity. In *Wynne, supra* at 254, the defendant made statements to the media that were "mirror images" of those made to the Legislature in furtherance of her efforts to influence legislation in her favor; her statements were therefore made "in connection with" legislative proceedings and protected by the anti-SLAPP statute. *Ibid.*

Corcoran was, to be sure, lobbying elsewhere for his position that pending House Bill No. 4153 should be defeated, but there is no indication in the record that his conversations with the subset of Foundation members were in furtherance of this goal. Although there was some talk in the second meeting as to how Corcoran's business position would change if House Bill No. 4153 passed, Corcoran's affidavit does not indicate that he in any way tried to persuade the Foundation members to support his position on the proposed amendment. Even if he had, such efforts would have been of no apparent moment, since none of the members present were legislators, and there is no evidence that those present were in a position to influence the Legislature in any way.

Corcoran's statements were made to Foundation members acting as his business competitors, or at least advancing adverse

financial interests. His purpose was thus plainly commercial in nature — to persuade those Foundation members present that the statute prohibited gate shows at the BCEC and to discourage, if not to prevent, the Foundation from sponsoring competing events. In *Cadle, supra,* the Supreme Judicial Court concluded that such commercially motivated communications do not fall within "petitioning activity" as contemplated by the statute. The defendant in *Cadle* had designed a Web site dedicated to the dissemination of information regarding what he alleged were the illegal practices of the plaintiff. *Cadle, supra* at 245. The court in *Cadle* determined that the defendant had set up the site "not as a member of the public who had been injured by these alleged practices, but as an attorney advertising his legal services. The Web site was, in essence, designed by [the defendant] to disseminate to the public information about Cadle and, by doing so, to attract clients to his law practice." *Id.* at 250. The court noted that although some statements on the Web site, "standing alone, had been made in connection with [the defendant's] petitions . . . [to state agencies and courts and,] at first glance, may appear to fall within the literal scope of activities protected by § 59H, because they were 'made in connection with an issue under consideration or review by a legislative, executive, or judicial body', . . . it is the palpable commercial motivation behind the creation of the Web site that so definitively undercuts the petitioning character of the statements contained therein." *Id.* at 250, 252.

4. *Remaining statutory definition.* Bayside's assertion that Corcoran's statements qualify for protection as "any other statement falling within constitutional protection of the right to petition government" is also unavailing. Although Bayside and Corcoran indeed engaged with Foundation members in a debate about the meaning of the Act, and the issue of allowing gate shows at the BCEC was certainly a live controversy in both the Legislature and the media, such private conversations in a business context about extant and pending legislation simply did not amount to statements that petition the government. They accordingly do not fall within the protective ambit of the statute. See *Global, supra* at 605.

*Conclusion.* Given that (1) the Foundation is not a legislative,

executive, or judicial body; (2) the Foundation is not a public forum; (3) Corcoran only tangentially discussed pending legislation with certain Foundation members who, in any event, were not members of the Legislature; and (4) Corcoran's statements were made in a business context and were commercially motivated, Bayside has failed to meet its threshold burden of showing that Corcoran's statements were protected petitioning activities. In concluding that Bayside was not entitled to the protection of the anti-SLAPP statute, we of course imply no view as to the merits of North American's complaint.

The judgment dismissing North American's complaint and awarding Bayside attorney's fees is reversed, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*