NORTH AMERICAN EXPOSITIONS COMPANY LIMITED PARTNER-
SHIP & others[1] *vs.* JOSEPH J. CORCORAN, JR., & others.[2]

Suffolk. October 7, 2008. - January 7, 2009.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & BOTSFORD, JJ.[3]

*"Anti-SLAPP" Statute. Constitutional Law,* Right to petition government.
*Practice, Civil,* Declaratory proceeding, Amendment, Attorney's fees.
*Unlawful Interference. Contract,* Implied covenant of good faith and fair
dealing. *Good Will. Consumer Protection Act,* Unfair or deceptive act.
*Words,* "Matters of public concern."

In a civil action brought by the conductor of consumer shows against the
owners, operators, and managers of a convention center (defendants), the
judge properly granted the defendants' special motion to dismiss pursuant
to the "anti-SLAPP" statute, G. L. c. 231, § 59H, with respect to the
plaintiff's claim for injunctive relief, where the defendants met their burden
of demonstrating that challenged statements made by the defendants'
representative (who was also a named defendant) to members of a statutorily
created charitable foundation were statements made before an executive
body [859-861] and that his statements constituted petitioning [861-864]
and were solely petitioning [864-865]; and where the plaintiff did not meet
its burden of demonstrating that the basis for the defendants' representative's
activities were devoid of any reasonable factual support or any arguable
basis in law [865-867], and thus there was no need to determine whether
the defendants' representative's petitioning caused actual injury to the
plaintiff [867]; further, the judge properly granted the special motion to
dismiss with respect to the plaintiff's claim for declaratory relief, where
that claim arose solely out of the petitioning activities at issue in the claim
for injunctive relief [868].

In a civil action brought by the conductor of consumer shows against the own-
ers, operators, and managers of a convention center (defendants), the judge
properly granted the defendants' special motion to dismiss pursuant to the
"anti-SLAPP" statute, G. L. c. 231, § 59H, with respect to the plaintiff's
claim for tortious interference with a prospective business advantage, where
the claim arose out of protected petitioning activity [868-869]; likewise, the
judge properly dismissed the plaintiff's claim of breach of the implied

---

[1]Joseph B. O'Neal, Mary E. O'Neal, Kathleen A. McAlpine, Brenda J.
Stafford, and Christine M. Forcier, as they are general partners of North
American Expositions Company Limited Partnership.

[2]Hub Expo Management, LLC; Bayside Associates Limited Partnership;
Bayside Expo Center, Inc., in its corporate capacity and as it is general partner
of Bayside Associates, LP; and Corcoran, Mullins, Jennison, Inc.

[3]Justice Greaney participated in the deliberation on this case prior to his
retirement.

covenant of good faith and fair dealing, where the plaintiff's claim of entitlement to notice of termination of its licenses to conduct its shows was without merit, as was its claim that the defendants attempted to convert the plaintiff's good will for their own purposes [869-870]; further, the complaint failed to state a claim of violation of G. L. c. 93A [870-871].

In a civil action, the judge did not abuse his discretion in denying the plaintiff's motion to amend its complaint to add a claim for tortious interference with a contractual relationship, where allowing the motion would have been futile. [871-872]

A Superior Court judge did not abuse his discretion in determining an award of attorney's fees following the grant of the defendants' special motion to dismiss pursuant to G. L. c. 231, § 59H. [872]


CIVIL ACTION commenced in the Superior Court Department on June 30, 2005.

A special motion to dismiss was heard by *Allan van Gestel,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Robert E. McLaughlin, Sr.* (*Michael Eby* with him) for the defendants.

*Howard M. Cooper* (*Edward Foye* with him) for the plaintiffs.

COWIN, J. In this case we consider whether a complaint against the owners and operators of a convention center was properly dismissed under G. L. c. 231, § 59H. This statute, commonly known as the "anti-SLAPP" ("strategic litigation against public participation") statute,[4] is intended to protect the "exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." *Duracraft Corp.* v. *Holmes Prods. Corp.,* 427 Mass. 156, 161 (1998), quoting 1994 House Doc. No. 1520. It creates a special motion to dismiss for the prompt resolution of SLAPP suits, actions designed not to win, but rather "to deter or retaliate against individuals who seek to exercise their right of petition." *Wenger* v. *Aceto,* 451 Mass. 1, 4 (2008).

A judge in the Superior Court dismissed the suit because he determined that statements by one of the defendants' principals made to members of the South Boston Community Development Foundation (Foundation) were protected petitioning activity.

---

[4]See *Duracraft Corp.* v. *Holmes Prods. Corp.,* 427 Mass. 156, 160 n.7 (1998), citing Pring, SLAPPS: Strategic Lawsuits Against Public Participation, 7 Pace Envtl. L. Rev. 3, 4 (1989).

The plaintiffs contend that the judge erred because the Foundation is not a legislative or executive body within the meaning of G. L. c. 231, § 59H, and also because the defendants' statements were not restricted solely to petitioning activity. Concluding that the Foundation is an executive entity and that the defendants' statements were based solely on protected petitioning activity, we affirm the judgment of dismissal.

*Facts and procedural history.* The facts are summarized from the pleadings and affidavits in the record. See G. L. c. 231, § 59H.[5] North American Expositions Company Limited Partnership (North American) had conducted consumer shows at the Bayside Exposition Center (BEC), which is located in the South Boston section of Boston, from 1983 through the filing of this litigation. These shows included North American's three major Boston shows: the New England Boat Show (Boat Show), the New England Camping and Recreational Vehicle Show (RV Show), and the North American Home Show (Home Show). When the parties first entered into the rental agreements to conduct these shows, the BEC, at 260,000 square feet, was the only venue in Boston capable of accommodating such events.

Consumer or "gate" shows are intended for a local audience, people who drive to the venue, visit the show for a few hours, and return home.[6] Producers of gate shows strive to become known to the local community by conducting the same show in the same city on roughly the same date each year. In order to schedule and establish contracts with a sufficient number of exhibitors, who themselves schedule appearances around the country years in advance, gate show producers require significant lead time.

In 1997, the defendants, who are the owners, operators, and managers of the BEC (collectively, Bayside), commenced an action against North American concerning payment of police details for North American's shows. This litigation was resolved in

---

[5]"[T]he court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." G. L. c. 231, § 59H. The parties' affidavits indicate that there are a few disputed facts that are not material to our decision. We include and rely only on the undisputed facts.

[6]Conventions, in contrast, are designed to attract out-of-town visitors who typically stay for longer periods of time and make use of tourism-related industries such as hotels, restaurants, taxis, and sightseeing activities.

2000 by a settlement agreement. In 2001, as their licensing agreements were due to expire, the relationship between North American and Bayside deteriorated. North American filed an action alleging what it asserted was Bayside's obligation, arising as part of the settlement agreement regarding the police details, to extend the license agreements. The parties eventually reached a second settlement agreement under which Bayside granted North American licenses for the Home Show through 2003 and for the Boat and RV Shows through 2006.

In 2004, the 516,000 square foot, publicly funded Boston Convention and Exhibition Center (BCEC) opened. The BCEC is operated by the Massachusetts Convention Center Authority (Authority). It was designed to host large national and international conventions, to enable Boston to be competitive with other convention centers nationwide, and to attract visitors to the city of Boston and surrounding areas. This legislative purpose is described in detail in the preamble to the BCEC's enabling legislation, St. 1997, c. 152 (Act). Concerned about the potential impact of the BCEC on the surrounding community, the Legislature also established the Foundation and the South Boston Community Development Fund (Fund) as a charitable trust, and provided that the Foundation would administer the Fund. St. 1997, c. 152, § 4 (g) (ii), (iv).[7] Section 4 (g) (iv) of the Act provided that the Foundation was to dispense monies from the Fund "for the benefit of the South Boston residential, charitable and business communities which may be adversely impacted by the [BCEC]." To this end, § 4 (g) (ii) provided that the Foundation could host "no less than three" charitable events at the BCEC annually.[8,9]

---

[7]Statute 1997, c. 152, §§ 4 (g) and 15, were significantly amended in 2006. Except where otherwise indicated, all references to St. 1997, c. 152 (Act), are to the statutory language as it existed in 2005.

[8]Section 4 (g) (i) of the Act provided, in relevant part:

"The Community Development Fund shall consist of monies held in a Massachusetts Charitable Trust, to be placed in a money market interest-bearing account to be administered by the South Boston Community Development Foundation."

Section 4 (g) (iii) further described the Fund as "The South Boston Community Development Fund."

[9]Section 4 (g) (ii) of the Act provided:

"Notwithstanding the prohibition against gate shows in subsection (d)

The Act specifically protected the BEC and the other then-existing exposition and convention centers in Boston, by name, from the potential loss of events to the BCEC. Section 15 (*a*) of the Act provided that the Authority could contract to provide national and international marketing efforts that would benefit both public and private facilities. Section 15 (*b*) of the Act stated:

> "The Authority is hereby directed, upon the written request of such a private owner or operator of any for-profit facility in the city which is in existence as of July 1, 1997 which contains not less than 100,000 square feet of contiguous floor area for conventions, trade shows, consumer shows, meetings, assemblies and convocations, to contract with such private owner or operator to mutually limit the marketing or use, or both, of the facilities or portions thereof under the jurisdiction and control of the Authority and said public or private entity."

Section 4 (*g*) (ii) of the Act also provided that the Foundation, when sponsoring its charitable events, "shall not solicit any event previously hosted by the Hynes convention center, the World Trade Center or the [BEC] in the ten year period before the effective date of this act, without the consent of the affected facility."

In August of 2001, North American contacted the Authority and requested information about renting space at the BCEC. The Authority responded that it could not host consumer shows under its enabling legislation; by letter, it suggested that North American

of section 15, in consideration of the project's impact, the Authority shall allow the South Boston Community Development Foundation to sponsor no less than three charitable events annually at the [BCEC], and shall include access to on site parking facilities. Said events shall be scheduled mutually by the Authority and the foundation so as not to conflict or interfere with the regular operation of the [BCEC]. Said community events shall not compete with the [BCEC] and shall not solicit any event previously hosted by the Hynes convention center, the World Trade Center or the [BEC] in the ten year period before the effective date of this act, without the consent of the affected facility. Said events shall be sponsored by the foundation for the purposes set forth in this subsection; provided, further, that the net proceeds of said events shall not be used for any purpose other than those described in this subsection. The Authority shall deposit said proceeds, including, but not limited to, on site parking fees in the Community Development Fund."

contact its legislator in an effort to amend the Act. North American subsequently engaged in various lobbying efforts, including one in the spring of 2004 in support of an amendment to the budget to allow the BCEC to hold any consumer or gate show requiring in excess of 300,000 square feet. This amendment was defeated in April, 2004.

In June, 2004, shortly after the Foundation was established, North American approached the Foundation and suggested that the Foundation host the RV and Boat Shows at the BCEC. The following winter, another bill was introduced to amend the BCEC enabling legislation. This bill, 2005 House Doc. No. 4153, would have permitted the BCEC to host gate shows if the shows had previously been held at a "private facility" and the private owner "refuses" to renew the agreement. In the spring of 2005, the Foundation contacted Joseph Corcoran, head of Bayside, seeking his opinion whether, under the terms of the Act, the Foundation could host North American's RV and Boat Shows.

In meetings at Boston City Hall on February 1, 2005, and in a South Boston restaurant on March 8, 2005, Corcoran advised several Foundation members that he did not believe the Foundation could host North American's gate shows under the terms of the Act.[10] Corcoran stated that he understood the Foundation's position regarding the Act but disagreed with it, and that he believed that the Foundation was authorized only to host charitable events. He explained that Bayside had already lost significant revenue because the BCEC was hosting trade shows formerly held at the BEC, Bayside's existence was threatened, and the continuing legislative prohibition on gate shows was critical to Bayside. Corcoran also stated that North American had not "responded adequately" to Bayside's requests for proposals (RFPs) for a boat show and an RV show, and showed the Foundation members North American's response, which consisted of handwritten notes on the RFP letter. At the second meeting, a Foundation member told Corcoran that an amendment to the Act was

---

[10]These meetings were attended by four Foundation members (three South Boston business leaders appointed by the Governor and the South Boston city councillor), plus the Foundation's counsel, Corcoran, and Bayside's community liaison, Catherine O'Neill.

pending that would eliminate Bayside's "monopoly" and com-
mented, "You're in the cat bird seat now, but what if the legisla-
tion changes, you could lose everything."

North American asserts that, because of Corcoran's state-
ments during these meetings, the Foundation became disinclined
to sponsor the Boat and RV Shows and contacted another spon-
sor to host similar shows. North American commenced this
litigation against Bayside in the Superior Court on June 30,
2005. Its verified complaint included claims for preliminary and
permanent injunctive relief prohibiting Bayside from "interfer-
ing with North American's advantageous relationship with the
Foundation" and "from purporting to 'withhold' " its consent
to the Foundation's sponsorship of North American's shows,
"since no consent is required under the Act." Shortly thereafter,
North American filed a separate motion for a preliminary injunc-
tion and served, but did not file, a motion for partial summary
judgment.[11] Following a hearing, the motion for a preliminary
injunction was denied on July 19, 2005.

On July 18, 2005, North American testified before the Joint
Committee on State Administration and Regulatory Oversight
(Joint Committee) in reference to 2005 House Doc. No. 4153. In
contravention of legislative rules, the hearing was expedited and
not publicly announced. Written testimony and documents pre-
sented at the hearing concerned the Foundation's authority to
host gate shows under the Act, and the relationship between
North American and Bayside. Corcoran subsequently met with
several members of the Joint Committee to discuss Bayside's
views regarding the same issues. Both parties engaged in exten-
sive lobbying; their respective positions on 2005 House Doc.
No. 4153 generated media coverage in a major newspaper.[12]

---

[11]The motion for partial summary judgment was served on Bayside pursu-
ant to Rule 9(a) of the Rules of the Superior Court, but it was not filed, after
the Superior Court judge's denial of North American's motion for a preliminary
injunction.

[12]An editorial described the conflicting views of the parties and the less
than clearly worded language of the Act and stated: "Clarity would be welcome,
but not in the form of a special-interest bill that North American is quietly
steering through the Legislature to get it into the [BCEC] under the auspices
of the [F]oundation. The [L]egislature ought to think hard, with plenty of
public input, before it amends the 1997 law." Boat Show at Sea, Boston
Globe, Editorial, August 10, 2005.

Bayside filed its special motion to dismiss under G. L. c. 231, § 59H on September 23, 2005. A judge in the Superior Court granted Bayside's motion; the Appeals Court reversed and remanded for further proceedings. See *North Am. Exposition Co. Ltd. Partnership* v. *Corcoran*, 70 Mass. App. Ct. 411, 423 (2007). We granted Bayside's petition for further appellate review.

*Discussion.* 1. *Dismissal of claims for injunctive and declaratory relief under the anti-SLAPP statute.* Count I of North American's complaint sought injunctive relief prohibiting Bayside from "purporting to 'withhold' [its] consent" to the Foundation's sponsorship of North American's shows, based on Corcoran's statements to the Foundation that he did not believe the Foundation could host gate shows under the terms of the Act. Relying on the "broad construction" courts have given petitioning activities, see, e.g., *Office One, Inc.* v. *Lopez*, 437 Mass 113, 122-123 (2002), a Superior Court judge ruled that Corcoran's statements about Bayside's rights under the Act were the type of petitioning activity protected by G. L. c. 231, § 59H. The judge also determined that all of North American's claims implicated protected petitioning activity. In deciding whether the Foundation was a "legislative, judicial, [or] administrative bod[y] [or] other public for[um]," the judge noted that it was a "creature of . . . statute." Citing the intent of the anti-SLAPP statute, he concluded that, "if 'statements made by one participant in a pending governmental proceeding in an effort to settle the controversy,' [*Plante* v. *Wylie*, 63 Mass. App. Ct. 151, 159 (2005)]," and statements on a private Web site designed as a public forum about town government, *MacDonald* v. *Paton*, 57 Mass. App. Ct. 290, 295 (2003), were protected, then "comments to the Foundation about its authority under [the Act]" were also protected.

The Appeals Court reversed, holding that the Foundation was not a governmental entity within the meaning of G. L. c. 231, §. 59H, and therefore that Corcoran's statements were not made before a legislative or executive body or in another government proceeding. See *North Am. Expositions Co. Ltd. Partnership* v. *Corcoran, supra* at 419, citing *Office One, Inc.* v. *Lopez, supra* at 123 n.15, and *Kobrin* v. *Gastfriend*, 443 Mass. 327, 335 (2005). The Appeals Court held also that the Foundation could

not constitute a public forum because "[t]here is no indication that [the Foundation] has functioned at any time in a manner involving public participation," and that Corcoran's statements were not made "in connection with" an issue under review by a legislative body. *North Am. Expositions Co. Ltd. Partnership* v. *Corcoran, supra* at 418-420. The court concluded that, rather than involving public participation or a public forum, the meetings between Corcoran and the Foundation were "privately arranged and privately held," *id.* at 419, and that Corcoran's purpose in attending the meetings was "plainly commercial in nature — to persuade those Foundation members present that the [Act] prohibited gate shows at the BCEC and to discourage, if not prevent, the Foundation from sponsoring competing events." *Id.* at 422.

a. *Whether the Foundation is a legislative or executive body under the anti-SLAPP statute.* The Foundation was created by the Legislature to perform a public purpose.[13] It is comprised of the senator and representative from South Boston, the South Boston city councillor, three South Boston business owners appointed by the Governor, and three representatives of local social service agencies appointed by the mayor of Boston. The Foundation administers a charitable trust that was established to benefit the residential, charitable, and business communities of South Boston. In addition, the Foundation is statutorily defined as a "committee" and must submit "detailed" annual financial reports to "the secretary of administration and finance and the house and senate committees on ways and means." St. 1997, c. 152, § 4 (*g*) (v). The Foundation determines to whom, how much, and

---

[13]Section 4 (*g*) (i) of the Act provided, in relevant part:

"The South Boston Community Development Foundation or foundation shall consist of a committee of nine members: three members appointed by the governor who shall be business owners from the locally impacted neighborhood; three members appointed by the mayor who shall be representatives of local social service agencies; the senator from the first Suffolk district or his designee, who shall be a non-voting member; the representative from the fourth Suffolk district or his designee, who shall be a non-voting member; and the Boston city councilor from District two or his designee; all of whom, with the exception of the elected officials, shall be residents of South Boston and shall serve a two year term which may be extended by reappointment."

when to distribute monies from the Fund it administers in further-
ance of its legislatively defined purpose.

The Foundation, therefore, possesses attributes sufficient to be
considered an executive body under G. L. c. 231, § 59H. It is not
dispositive that the Foundation has no power to issue regulations.
We find unpersuasive North American's arguments that the
Foundation is a "private" charitable foundation that has no abil-
ity to create law or issue regulations, "does not formulate public
policy," and "has no administrative duties." The Foundation ex-
ists to administer public funds for a public purpose; it determines
how the funds will be disbursed to best effectuate its legislative
mandate to benefit the community of South Boston.

b. *Whether Corcoran's activities were petitioning.* A party's
exercise of its right to petition is defined under the anti-SLAPP
statute as:

> "any written or oral statement made before or submitted to
> a legislative, executive, or judicial body, or any other gov-
> ernmental proceeding; any written or oral statement made in
> connection with an issue under consideration or review by a
> legislative, executive, or judicial body, or any other gov-
> ernmental proceeding; any statement reasonably likely to
> encourage consideration or review of an issue by a legisla-
> tive, executive, or judicial body, or any other governmental
> proceeding; any statement reasonably likely to enlist public
> participation in an effort to effect such consideration; or any
> other statement falling within constitutional protection of
> the right to petition government."

G. L. c. 231, § 59H.

Consistent with the expressed legislative intent, "petitioning"
has been consistently defined to encompass a "very broad"
range of activities in the context of the anti-SLAPP statute. See
*Duracraft Corp.* v. *Holmes Prods. Corp.*, 427 Mass. 156, 161-
162 (1998), citing Pring, SLAPPS: Strategic Lawsuits Against
Public Participation, 7 Pace Envtl. L. Rev. 3, 5 (1989) (right to
petition may involve "reporting violations of law, writing to
government officials, attending public hearings, testifying before
government bodies, circulating petitions for signature, lobbying
for legislation, campaigning in initiative or referendum elec-

tions, being parties in law-reform lawsuits, and engaging in peaceful boycotts and demonstrations"). Petitioning includes all "statements made to influence, inform, or at the very least, reach governmental bodies — either directly or indirectly." *Global NAPS, Inc.* v. *Verizon New England, Inc.*, 63 Mass. App. Ct. 600, 605 (2005). In order to determine if statements are petitioning, we consider them in the over-all context in which they were made. See *Wynne* v. *Creigle*, 63 Mass. App. Ct. 246, 253-254 (2005) (fire fighter's widow made statements to press that were "essentially mirror images" of statements made at disciplinary hearing during investigation of plaintiff and therefore her statements were petitioning activity).

Statements made outside any formal governmental proceedings have often been considered petitioning activity. See, e.g., *Office One, Inc.* v. *Lopez*, 437 Mass. 113, 122-123 (2002) (holding that tenants' communications with Federal Deposit Insurance Corporation, elected officials, and other unit owners, seeking to prevent sale of condominium unit to operator of "telephone sex" business, were based solely on petitioning activity); *Baker* v. *Parsons*, 434 Mass. 543, 545-551 (2001) (letter from biologist to environmental reviewer from Massachusetts natural heritage and endangered species program, and statements to member of United States Fish and Wildlife Service, after biologist was asked to give her opinion about island bird habitat, were petitioning activity); *MacDonald* v. *Paton*, 57 Mass App. Ct. 290, 293-294 (2003) (Web site hosted by defendant that referred to town selectman as "Gestapo agent" was public forum and therefore protected petitioning activity, because it commented on local affairs in community, and allowed users to submit comments electronically). The *MacDonald* court concluded that the defendant's Web site was a "technological version of a meeting of citizens on the Town Green, a space where concerned individuals could come together to share information, express political opinions, and rally on town issues of concern to the community." *MacDonald* v. *Paton, supra* at 295.

We conclude that Corcoran's statements to the Foundation were petitioning activity under the terms of G. L. c. 231, § 59H. In both meetings, Corcoran asserted what he believed were

Bayside's rights under the Act.[14] Corcoran made these statements in an effort to convince the Foundation not to sponsor gate shows, including any of North American's shows. The right to petition a governmental body for redress of a grievance is the very essence of petitioning activity. See *Duracraft Corp.* v. *Holmes Prods. Corp., supra* at 160. Here, the Foundation had the power to redress Bayside's harm merely by choosing not to sponsor North American's shows or other gate shows.[15]

Furthermore, that the motive for the speech be a matter of "public concern," although part of anti-SLAPP provisions in other States, is not a requirement of G. L. c. 231, § 59H. See *Duracraft Corp.* v. *Holmes Prods. Corp., supra* at 163-164 & n.12. Thus, notwithstanding North American's argument that Corcoran's petitioning activity was merely commercial speech, the fact that the speech involves a commercial motive does not mean it is not petitioning. See *Office One, Inc.* v. *Lopez, supra* at 122 (in determining whether conduct is based on petitioning activity alone, "motive behind the petitioning activity is irrelevant").

This court's decision in *Cadle Co.* v. *Schlichtmann*, 448 Mass 242 (2007), upon which North American relies for its contention that communications with a commercial motive may not be petitioning, involved very different circumstances. In the *Cadle* decision, an attorney set up a Web site ostensibly describing the allegedly illegal business practices of a collections firm. We determined that the Web site was actually created for com-

---

[14]Section 4 (*g*) of the Act does not explicitly state whether the Foundation, the Authority, or both execute contracts with the charitable event producers for events that the Foundation sponsors. It is clear, however, that the Foundation selects the events that it sponsors, and that Corcoran's activity was directed to the Foundation's power to decline sponsorship of particular shows. See St. 1997, c. 152, § 4 (*g*) (ii)-(iv).

[15]We are not dismissing the possibility that Corcoran's statements urging members of the Foundation, two of whom are State legislators and one of whom is a city councillor, not to support 2005 House Doc. No. 4153 were also petitioning activity under the second and third clauses of the definition. The conversation in which some members of the Foundation advocated for the proposed amendment, and Corcoran argued that the amendment would effectively destroy Bayside, might be considered "any . . . oral statement made in connection with an issue under consideration or review by a legislative . . . body" or "any statement reasonably likely to encourage consideration or review of an issue by a legislative . . . body."

mercial reasons in order to attract customers for the attorney's business, and therefore that a complaint filed against the attorney by the collections company could not be dismissed as having been based solely and exclusively on the attorney's petitioning activity. We reached this result even though many quotes on the Web site contained the attorney's statements to the banking commissioner or other complaints he had filed in various courts. *Id.* at 250-252. We stated that the attorney published the statements "not as a member of the public who had been injured by these alleged practices, but as an attorney advertising his legal services. The Web site was, in essence, designed . . . to disseminate to the public information about [the collections company] and, by doing so, to attract clients to [the attorney's] law practice." *Id.* at 250.

Here, unlike the attorney's statements in *Cadle,* Corcoran gave the Foundation his opinion regarding the correct interpretation of the Act, and sought redress from the Foundation by asking it not to participate in activities he thought violated Bayside's rights. He requested the Foundation, as a governmental entity, not to contract with North American or other producers of gate shows, undertakings he asserted were prohibited under the Act. This is precisely the type of communication protected under the anti-SLAPP statute because it has "the potential or intent . . . directly or indirectly to influence, inform, or bring about governmental consideration of the issue." *Global NAPS, Inc.* v. *Verizon New England, Inc., supra* at 607.

c. *Whether Corcoran's activities were solely petitioning.* Having determined that Corcoran's statements meet the requirements of petitioning activity, we turn to whether they were solely petitioning. As a threshold matter, a defendant seeking dismissal under the anti-SLAPP statute must demonstrate, through pleadings and affidavits, that the plaintiff's claims are based on the defendant's petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities. *Wenger* v. *Aceto,* 451 Mass. 1, 5 (2008).

North American argues that its complaint was not based on petitioning alone because it alleged also a breach of the implied covenant of good faith and fair dealing and violations of G. L. c. 93A, § 11. The record indicates, however, that the basis of

the conduct complained of is Corcoran's statements about Bayside's interpretation of the provisions of the Act and Bayside's intention to enforce its rights under the Act.[16] These statements were made in an effort to convince the Foundation not to sponsor North American's shows. North American's complaint, therefore, has no substantial target other than Bayside's petitioning activity. Compare *Donovan* v. *Gardner*, 50 Mass. App. Ct. 595, 598-601 (2000) (where plaintiffs opposed defendants' expanded use of defendants' residential property for horse riding school, activities such as hiring helicopters to fly over defendants' property, soliciting funds from other neighbors, and standing on property line yelling at defendants, in conjunction with appeals to State and local agencies, were also protected petitioning activities).

In addition, it is not necessary, as North American suggests, to deny Bayside's motion to dismiss under G. L. c. 231, § 59H, relative to the claims for injunctive and declaratory relief, because of the presence of other claims in North American's complaint. See *Wenger* v. *Aceto, supra* at 5-6, 9 (allowing dismissal of some counts and reversing dismissal of G. L. c. 93A claims).

d. *Basis for Corcoran's petitioning activities.* If, as here, a defendant makes a threshold showing for dismissal under the anti-SLAPP statute, the burden shifts to the plaintiff to demonstrate through pleadings and affidavits, by a preponderance of the evidence, that the defendant's petitioning activities were "devoid of any reasonable factual support or any arguable basis in law" and that the petitioning activities caused actual injury to the plaintiff. *Wenger* v. *Aceto, supra* at 5, quoting G. L. c. 231, § 59H. See *Cadle Co.* v. *Schlichtmann, supra* at 249. To prevail against a special motion to dismiss, it is not sufficient to show that the petitioning was based on an error of law. The plaintiff must show that no reasonable person could conclude that there

---

[16]We do not consider North American's recitations in its factual background about conduct involved in the prior two Superior Court actions between the parties. That conduct is not part of the record here. The same conduct and claims were asserted and vigorously pursued in the 2001 litigation, and after extensive discovery, the parties entered a stipulation of dismissal with prejudice in that action. See *Jarosz* v. *Palmer*, 436 Mass. 526, 535-536 (2002); *Heacock* v. *Heacock*, 402 Mass. 21, 23-24 (1988).

was an arguable basis in law that would support the defendant's position. *Baker* v. *Parsons*, 434 Mass. 543, 555 n.20 (2001).

North American contends that Bayside had no arguable basis in law for its statements to the Foundation and that no reasonable person could have made Bayside's claims. North American states that the Act prohibited the Foundation from "soliciting" any event previously hosted at the BEC without Bayside's consent, but did not prohibit the Foundation from "sponsor[ing]" or "enter[ing] into negotiations to sponsor" such events. North American argues that because it approached the Foundation, the Foundation can not be said to have "solicited" North American.

North American has made no showing that Bayside's activities were "devoid of any reasonable factual support or any arguable basis in law." G. L. c. 231, § 59H. See *Baker* v. *Parsons, supra* at 553-554. Corcoran asserted that a for-profit gate show did not meet the requirements of a "charitable event" under the Act. Although the Act does not define "charitable event," this argument cannot be said to be "devoid of . . . any arguable basis in law." G. L. c. 231, § 59H. Section 15 (*d*) of the then-existing language of the Act stated that "[n]otwithstanding any provision of this act to the contrary, [the BCEC] . . . shall not be marketed or utilized for so-called gate shows or other similar shows." The preamble to the Act, and the reports commissioned under the terms of the Act when determining the type of convention center to build, indicate that the BCEC was designed to attract large national conventions and the attendant tourism dollars, not gate shows, to Boston.[17] The legislative history concerning the addition of § 4 (*g*) of the Act, the section establishing the Foundation, indicates that the ordinary for-profit events at the BCEC

---

[17]The preamble to the Act states, in relevant part: "The lack of adequate convention and exhibition facilities within the commonwealth with the capacity to service major national and international conventions has impaired the commonwealth's ability to compete within that market and to develop this important aspect of our tourism industry. . . . [B]y attracting nonresident visitors to the commonwealth through the development of a suitable convention and exhibition center, it is expected that substantial economic development will be stimulated in such tourism-related industries as transportation, hotels, restaurants, recreation, entertainment and retail sales establishments." St. 1997, c. 152, § 1. The accounting firm hired to study different options stated in its report that, "[s]ince consumer shows generally draw a resident attendance within a drive radius, they generate limited economic impact for a community."

were to be clearly distinguished from "charitable events"; during debate immediately prior to the vote, the senator who proposed the amendment stated, "On dark days, when the Fleet Center is not being used, it is available for community activities and fund-raising events. This would provide the same option for the [BCEC]." Remarks of Senator Lynch, State House News Service (Senate Floor Debate), July 24, 1997.

Thus, Bayside had a plausible argument that the Foundation could never sponsor the for-profit type of event that North American provides. Although one sentence in § 4 (*g*) (ii) of the Act refers to "charitable events" and another refers to "community events," neither is the kind of commercial undertaking in which North American engages.[18]

Corcoran stated also that Bayside had to give its approval in order for the Foundation to host shows that North American had held at the BEC within the ten years prior to enactment of the Act. Again, according to the language of § 15 of the Act, in conjunction with § 4 (*g*), Corcoran's statement was a reasonable interpretation. Section 15 indicates the legislative concern with protecting the financial interests of the three then-existing convention centers. As the motion judge stated, the Act contains the "expressed legislative intent not to harm presently existing local exhibition halls, including, by name, the [BEC]." While the judge correctly pointed out that the Act is poorly worded, Bayside had a reasonable argument based on the statutory language that the Foundation could not sponsor the competitive gate shows at issue without Bayside's approval.

e. *Injury to North American.* North American claims it suffered actual harm when the Foundation "backed off from its prior enthusiastic support for sponsoring two of North American's important gate shows." Because we conclude that there was an arguable legal basis for Bayside's petitioning and that the special motion to dismiss was properly allowed, we need not decide whether Bayside's petitioning caused actual injury to North American.[19]

---

[18]We decline to adopt North American's tortured interpretation that the Act requires the Foundation to use the funds for charitable purposes, but that the event itself need not be a charitable event.

[19]We observe that 2005 House Doc. No. 4153 was not adopted. However,in 2006, 2005 House Doc. No. 4493 was enacted as an emergency measure. It

f. *Claim for a declaratory judgment.* North American argues that its claim for a declaratory judgment, appearing in Count II of its complaint, involved an actual controversy and should not have been dismissed under the anti-SLAPP statute. Ordinarily, when an action for declaratory relief is properly brought, the parties are entitled to a declaration of rights and we do not dismiss the complaint. *Mscisz* v. *Kashner Davidson Sec. Corp.*, 446 Mass. 1008, 1010 (2006). However, dismissal of a claim for declaratory judgment is appropriate in limited circumstances. See, e.g., *The Harvard Crimson, Inc.* v. *President and Fellows of Harvard College*, 445 Mass. 745, 748 n.5 (2006) (dismissing action for declaratory judgment because relief was not denied on merits, but, rather, complaint was dismissed under Mass. R. Civ. P. 12 [b] [6], 365 Mass. 754 [1974], without deciding merits). The declaratory judgment claim here arises solely out of the petitioning activities at issue in the claim for a preliminary injunction. In these circumstances, dismissal is appropriate. To allow the addition of a claim for declaratory relief to deprive the defendants of their immunity from suit under the anti-SLAPP statute would defeat the purpose and intent of the statute to protect against harassment and the burden of litigation.[20] Contrast *Garabedian* v. *Westland*, 59 Mass. App. Ct. 427, 432-433 (2003) (refusing to dismiss declaratory judgment action under anti-SLAPP statute because plaintiff's claims had substantial basis in addition to petitioning). The motion judge properly allowed Bayside's special motion to dismiss Count II under G. L. c. 231, § 59H.

2. *Dismissal of tort, contract, and G. L. c. 93A claims.* Bayside's special motion to dismiss stated that all of North American's claims were based solely on Bayside's petitioning activity. The Superior Court judge did not separately discuss

amended § 15 (*d*) of the Act to permit gate shows "if each gate show . . . uses 250,000 gross square feet or more of the [BCEC's] exhibition space," and amended § 4 (*g*) (ii) to prohibit the Foundation from sponsoring gate shows. St. 2006, c. 156, §§ 2, 5. Section 4 (*g*) (ii) was also amended to prohibit the type of financial arrangement that North American asserts it planned to enter into with the Foundation. St. 2006, c. 256, § 2.

[20]We do not suggest that there are no other reasons why a declaration should not have issued, such as the absence of the Foundation as a necessary party, see *DeSimone* v. *Civil Serv. Comm'n*, 27 Mass. App. Ct. 1177, 1179 (1989), but we need not address any of them.

Counts III, IV, and V of North American's complaint in his order allowing the special motion to dismiss. He did, however, discuss certain of these claims in his order denying North American's motion for a preliminary injunction, and indicated that they appeared to be based on petitioning activity. We conclude that all three claims were properly dismissed, some because of the anti-SLAPP statute and some for reasons other than that statute.

Count III asserts a claim for tortious interference with a prospective business advantage between North American and the Foundation, based on Corcoran's statements to the Foundation that he did not believe the Foundation could sponsor gate shows, and that Bayside would file suit if the Foundation did. This claim clearly arises out of protected petitioning activity and cannot be said to be tortious interference or to have been made in bad faith.

North American also claims a breach of the implied covenant of good faith and fair dealing (Count IV). North American argues that it was entitled to notice of termination of its licenses to hold its Boat and RV Shows and that Bayside failed to provide such notice. This claim is without merit. North American's licenses expired by their own terms in 2003 and 2006, and the license agreement contains no language requiring additional notice. The implied covenant of good faith and fair dealing does not create rights and duties not otherwise provided for in the existing contractual relationship. See *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). North American was well aware that its licenses terminated in 2006. As its own letters indicate, it began planning a move to the BCEC as early as 2001.

North American also argues that Bayside attempted to convert North American's good will for its own purposes because Bayside formed a "competing company." The factual recitations in the complaint assert that, rather than offering licenses to North American for future boat and RV shows, Bayside sent requests for proposals to produce boat and RV shows to a national list of producers, including North American. This argument is inadequate to assert a claim for conversion of good will. Good will has been defined as a company's positive reputation in the eyes of its customers or potential customers. See *Marine Contrs. Co.*

v. *Hurley*, 365 Mass. 280, 287-289 (1974); *Kroeger* v. *The Stop & Shop Cos.*, 13 Mass. App. Ct. 310, 316 (1982). Good will is generated by repeat business with existing customers, *New England Tree Expert Co.* v. *Russell*, 306 Mass. 504, 509 (1940), or by referrals to potential customers. See *Marine Contrs. Co.* v. *Hurley, supra* at 287-288. While good will may be protected, there is no legitimate business interest in protection from ordinary competition. *Id.* North American makes no claim here that Bayside attempted any deceptive use of North American's name or other intellectual property. Cf. *Professional Economics, Inc.* v. *Professional Economic Servs., Inc.*, 12 Mass. App. Ct. 70, 74-80 (1981). Moreover, the record indicates that Bayside twice requested in writing that North American submit RFPs, and that, in response to the second request, North American merely returned Bayside's letter with handwritten notations that it would produce the same event that it had always produced. North American's argument is essentially that it has a right to a monopoly in a particular geographic area because it has produced shows there in the past. Such a claim is clearly without merit. Cf. *Tober Foreign Motors, Inc.* v. *Reiter Oldsmobile, Inc.*, 376 Mass. 313, 327-328 (1978).

We observe in addition that neither the contentions regarding notice nor the contentions regarding good will appear in North American's complaint. The majority of the assertions in North American's complaint relating to the claim for breach of the covenant of good faith and fair dealing involve conduct previously litigated in the 1997 and 2001 actions. The only assertions of conduct other than that in the previously dismissed litigation are that Bayside would not extend North American's licenses beyond 2006 and instead both formed a company to produce its own shows and contracted with other show producers; that Bayside acknowledged its response to the RFPs, but took no further action; and that the license agreements between the parties contain an implied obligation of good faith and fair dealing of which Bayside committed a breach. North American fails to allege how the license agreements created an obligation that Bayside accept a response to its RFPs.

Count V of the complaint alleges violations of G. L. c. 93A, §§ 2 and 11. North American's brief states that the acts underly-

ing this claim are the same as those underlying the claim for breach of the implied covenant and good faith and fair dealing. North American also asserts that this count is based primarily on acts alleged in a proposed amended complaint involving a letter Bayside wrote to the Massachusetts Marine Trade Associates (MMTA) about North American's testimony before the Joint Committee. See part 3, *infra.* Like the claim for breach of the implied covenant of good faith and fair dealing, however, the complaint itself fails to make any assertions of acts outside of the prior litigation other than that Bayside engaged in "unfair and deceptive acts and practices."

3. *Denial of North American's motion to amend.* North American moved to amend its complaint to add a claim for tortious interference with its contractual relationship with the MMTA. North American argues that it sought to amend the complaint because it wanted to "allege an additional instance of interference with North American's relationship with its exhibits." The record indicates that this amendment involved claims relating to a July, 2005, letter from Bayside to the MMTA in response to North American's written testimony on 2005 House Doc. No. 4153. The letter stated that it was responding to North American's testimony at the hearing before the Joint Committee, and that it sought to correct some inaccuracies and erroneous statements in the testimony.

Whether to allow an amendment to a complaint is left to the discretion of the motion judge. See *Walsh* v. *Chestnut Hill Bank & Trust Co.,* 414 Mass. 283, 287 n.5 (1993). Bayside's letter to the MMTA was in response to North American's written testimony about a legislative amendment then under consideration. This is petitioning activity that falls squarely within the scope of G. L. c. 231, § 59H. In addition, the proposed amended complaint does not contain any allegation that the MMTA did not enter into or continue a business relationship with North American, a necessary element of any claim for interference with a contractual relationship. See *Buster* v. *George W. Moore, Inc.,* 438 Mass. 635, 652 (2003); *United Truck Leasing Corp.* v. *Geltman,* 406 Mass. 811, 812 (1990). Thus, allowing the motion to amend would have been futile, because North American's claims would still have been properly dismissed. See *All Seasons Servs., Inc.* v.

*Commissioner of Health & Hosps.*, 416 Mass. 269, 272 (1993) (while leave to amend should be given when justice so requires, futility of amendment good reason to deny motion to amend). There was no abuse of discretion in the motion judge's decision not to allow the motion to amend.

4. *Attorney's fees.* Once a court grants a special motion to dismiss under G. L. c. 231, § 59H, the award of attorney's fees, "including those incurred for the special motion and any related discovery matters," *id.*, is mandatory. See *McLarnon* v. *Jokisch*, 431 Mass 343, 350 (2000) (judge has no discretion whether to make award). We decline to uphold a fee award only if it is clearly erroneous. *Kennedy* v. *Kennedy*, 400 Mass. 272, 274 (1987).

Here, the motion judge found that, over-all, the amount of time billed was "substantial," but "warranted under the circumstances" because North American had acted "extremely aggressively." The record supports this finding. For instance, North American filed a motion for a preliminary injunction and served a motion for partial summary judgment within a few days of filing its initial complaint. In addition, the judge explained that the pleadings on the preliminary injunction were "extensive" and that the service of the motion for partial summary judgment involved a "flurry" of pleadings. Although the motion for summary judgment was never filed, North American's request for an expedited schedule and hearing required immediate work, as did other of North American's motions for expedited hearings. See *Office One, Inc.* v. *Lopez*, 437 Mass. 113, 126-127 (2002) (fees not limited to special motion).

The judge also found that, while Bayside's attorney's rates were reasonable, some of the time expended was "moderately excessive," and thus warranted a fifteen per cent reduction in the amount requested. He concluded that the time involved was too high to be "reasonable." We see no reason in the record to reverse the motion judge's determination of the allowable fees.

*Judgment affirmed.*