Krupp, Peter B., J.
Plaintiff Gerald Gentile (“plaintiff’) has sued defendants Biogen Idee, Inc. (“Biogen”) and Elan Pharmaceuticals, Inc. (“Elan”) (collectively “defendants”) to recover for injuries his wife, Diane Gentile (“Mrs. Gentile”), suffered after taking defendants’ drug, Tysabri (“Tysabri”). The case is before me on defendants’ motion for summary judgment and plaintiffs motion to amend his Second Amended Complaint. For the following reasons, defendants’ motion for summary judgment is ALLOWED and plaintiffs motion to amend is DENIED.
BACKGROUND
A. Record Facts
The summary judgment record, viewed in the light most favorable to plaintiff, contains the following facts material to this motion.
In 1981, Mrs. Gentile was diagnosed with multiple sclerosis (“MS”). MS is a chronic, progressive, disabling autoimmune disease of the central nervous system. It can lead to brain atrophy and cognitive impairment, confine an individual to a wheelchair or bed, and result in death. MS has no known cure.
In 2004, the United States Food and Drug Administration (“FDA”) first approved the prescription drug Tysabri for the treatment of relapsing forms of MS. Tysabri is intended to decrease the number of MS relapses and reduce and delay nerve damage and resulting disability.
Defendants collaborated on aspects of research, development and commercialization of Tysabri. Bio-gen, a Delaware corporation with its headquarters in Massachusetts, manufactured the drug and held the FDA license and regulatory responsibilities associated with it. Elan, a Delaware corporation with a principal place of business in California, distributed the drug and also marketed it to treat Crohn’s disease.
In February 2005, defendants received reports that two patients involved in clinical trials ofTysabri, who also concurrently used Avonex, another MS medication, developed progressive multifocal leukoencephalopathy (“PML”). PML is a rare viral brain infection caused by the J ohn Cunningham virus (“JCV”). A significant portion of the adult population has been exposed to JCV, which is typically harmless.[3]
On February 28, 2005, following the reports of the PML cases, Biogen withdrew Tysabri from the market and suspended its clinical trials.[4] Defendants attempted to better understand and quantify the risk of PML. In March 2006, an FDA advisory panel considered Biogen’s proposal to put Tfysabri back on the market. On June 5, 2006, the FDA approved returning Tfysabri to the market, subject to conditions and requirements to address the PML risk. One of these conditions required that Tfysabri only be prescribed in accordance with a mandatory risk evaluation and management strategy program, also known as the Tfysabri Outreach: Unified Commitment to Health (“TOUCH”) Program. The TOUCH Program was intended “to assess the risk of [PML] associated with [Tysabri], minimize the risk of PML, minimize death and disability due to PML, and promote informed risk-benefit decisions regarding TYSABRI® use.”
The TOUCH Program required, among other things: (1) prior to prescribing Tfysabri, a physician must acknowledge, in writing, that the physician understands the PML risk and must obtain a written acknowledgment of the risk from the patient; (2) prior to each Tfysabri infusion, a specially trained nurse must confirm that the patient has read the Medication Guide that includes the PML warnings; and (3) the nurse must also question the patient about the patient’s understanding of the PML risk and any new symptoms that could be early signs of PML.
Another condition for the reintroduction of Tfysabri to the market was the requirement of a “black box" warning to inform prescribers that Tfysabri use increases a patient’s risk of developing PML. The black box warning stated, in part:
[PML], an opportunistic infection caused by the JC virus that typically occurs in patients that are im- *609 munocompromised, has occurred in 3 patients who received TYSABRI® in clinical trials (see BOXED WARNING). Two cases of PML were observed in 1869 patients with multiple sclerosis treated for a median of 120 weeks. The third case occurred among 1043 patients with Crohn’s disease after the patient received 8 doses. The absolute risk for PML in patients treated with TYSABRI® cannot be precisely estimated, and factors that might increase an individual patient’s risk for PML have not been identified. There are no known interventions that can reliably prevent PML or adequately treat PML if it occurs. It is not known whether early detection of PML and discontinuation of TYSABRI® will mitigate the disease. There is limited experience beyond 2 years of treatment. The relationship between the risk of PML and the duration of treatment is unknown.
All three cases of PML occurred in patients who were concomitantly exposed to immunomodulators ... or were immunocomprised due to recent treatment with immunosuppressants . . . Ordinarily, therefore, patients receiving chronic immunosuppressant or im-munomodulatory therapy or who have systemic medical conditions resulting in significantly compromised immune system function should not be treated with TYSABRI® However, the number of cases is too few and the number of patients treated too small to reliably conclude that the risk of PML is lower in patients treated with TYSABRI® alone than in patients who are receiving other drugs that decrease immune function or who are otherwise immunocompromised.
The warnings also provided in the “Indications and Usage” section that “TYSABRI® increases the risk of [PML], an opportunistic viral infection of the brain that usually leads to death or severe disability (see BOXED WARNING AND WARNINGS, [PML]).” (Bold in original). Defendants also included this warning in Tysabri’s Medication Guide, which was provided to patients prior to enrolling in the TOUCH Program. The Medication Guide also stated that “PML usually happens in people with weakened immune systems. No one can predict who will get PML. There is no known treatment, prevention, or cure for PML.”
In early March 2006, in response to FDA’s request, Biogen submitted a report on the results of antibody testing conducted on available serum samples of patients who participated in the Tysabri clinical trials. The report concluded “there is no consensus on a clinically relevant cut off for the ELISA assay or JCV antibody detection.” Biogen continued to research the significance of the presence of JCV antibodies on the risk of developing PML.
Mrs. Gentile resided in New York. In November 2006, Mrs. Gentile’s doctor, Bianca Weinstock-Gutt-man, M.D. (“Dr. Guttman”), an MS specialist at the Jacobs Neurological Institute in Buffalo, New York, prescribed Tysabri for Mrs. Gentile. Before doing so, Dr. Guttman performed a JCV DNA test looking for JCV in Mrs. Gentile’s bloodstream. Mrs. Gentile tested negative. Also, in accordance with FDA requirements, Mrs. Gentile signed the TOUCH enrollment forms, which warned against PML, and acknowledged that “[m]y chance of getting PML may be higher if I am treated with other medicines that can weaken my immune system, including other MS treatments” and that “[i]t is also not known if treatment for a long period of time with TYSABRI can increase my chance for PML.”
At the time she prescribed Tysabri to Mrs. Gentile, Dr. Guttman was familiar with the prescribing information that was in effect, was enrolled as a TOUCH prescriber, was aware of the PML risks provided in the Tysabri warnings, understood the significance of black box warnings, and understood that JCV could cause PML. When Dr. Guttman prescribed Tysabri to Mrs. Gentile, the Tysabri warning indicated that “the relationship between the risk of PML and the duration of treatment is unknown.”
Mrs. Gentile received her first Tysabri infusion in January 2007. The label in effect at the time included the provision: “TYSABRI® increases the risk of [PML], an opportunistic viral infection of the brain that usually leads to death or severe disability.” The Tysabri infusions were effective in stabilizing Mrs. Gentile’s condition before she developed PML.
In July 2008, the first two Tysabri-associated PML cases were confirmed following Tysabri’s re-introduction to the market. After these reports, in August 2008, the FDA approved Biogen’s request to update the label to include the following: “There is limited experience beyond two years of treatment. The relationship between the risk of PML and the duration of treatment is unknown, but most cases of PML were in patients who received more than one year of treatment.” By July 24, 2009, eleven cases of Tysabri-associated PML had been confirmed since Tysabri was reintroduced to the market three years earlier.
In September 2009, Mrs. Gentile received her final Tysabri infusion, her thirty-third monthly infusion since January 2007. In October 2009, Mrs. Gentile was diagnosed with PML. Hers was the twenty-third confirmed case of PML after Tysabri’s re-approval. Mrs. Gentile died on December 15, 2009.
In late 2009, Biogen developed an assay that could reliably detect JCV antibodies in the blood stream, indicating prior exposure to JCV. On December 9, 2009, an advisory board of MS and regulatory experts concluded, however, that data on the JCV antibody assay “was too preliminary to be of predictive value.”
In November 2009, FDA approved Biogen’s request to update Tysabri’s label so that it included more details about the increased risks of PML with longer Tysabri treatment duration. In July 2010, FDA approved an update to the label that added warnings about a correlation between a patient’s prior immuno-suppressant treatments and PML.
*610 On September 8,2010, FDArejected Biogen’s proposal to add information to the Tysabri label regarding the significance of the JCV antibody status, concluding that “the Division does not believe that there is currently sufficient information to support the clinical utility of the anü-J CV antibody assay in determining the risk for PML. ”
On November 18, 2010, Biogen met with FDA. Again FDA rejected Biogen’s proposed change to the Tysabri label regarding the JCV antibody assay. FDA’s meeting minutes state that “[t]he usefulness of this test in treatment with Tysabri has not been established.”
In October 2011, Biogen, for a third time, requested FDA approval for this label change. On January 20, 2012, FDA announced it had cleared the JCV antibody assay and approved the associated Tysabri labeling change regarding the significance of a patient having antibodies for JCV on the chance of developing PML while being treated with Tysabri.
B. Procedural History
Plaintiff filed this case in September 2011. In June 2013, plaintiff filed an amended complaint with defendants’ assent. In September 2013, defendants moved to dismiss Counts II, IV and V of plaintiffs Amended Complaint. The Court (Curran, J.) dismissed Count n, which alleged a design defect, but denied the motion as to Counts IV (negligent misrepresentation) andV (fraud).
In February 2015, the Court allowed plaintiff to file a Second Amended Complaint. In the Second Amended Complaint, plaintiff pursues claims of negligence (Counts I), negligent undertaking (Count II), failure to warn Mrs. Gentile and her physician about particular risks associated with the drug (Count III), negligent misrepresentation (Count IV), fraud (CountV), breach of the implied warranty of merchantability (Count VI), violation of the Massachusetts Consumer Protection Act, G.L.c. 93A (Count VII), wrongful death (Count VIII), and causing pain and suffering (Count IX).
Defendants now move for summary judgment on all counts. In addition, plaintiff moves to amend the Second Amended Complaint to add newly discovered factual allegations bearing on Count II (negligent undertaking). I address the motion for summary judgment first.
DISCUSSION
I. The Summary Judgment Motion
A. The Applicable Standard
Summary judgment is appropriate when “there is no genuine issue as to any material fact and [] the moving party is entitled to ajudgment as a matter of law.” Mass.RCiv.P. 56(c). See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 712-16 (1991). A defendant moving for summary judgment may succeed by demonstrating that the nonmoving party has no reasonable expectation of proving an essential element at trial. Flesner v. Technical Commc'ns Corp., 410 Mass. 805, 809 (1991); Kourouvacilis, 410 Mass. at 716. Once the moving party establishes the absence of a triable issue, the opposing party must respond with specific facts establishing the existence of a genuine issue of material fact. Mass.R.Civ.P. 56(e). The nonmoving party may not merely rest on assertions of dispute, but must show the existence of actual disputes of fact. LaLonde v. Eissner, 405 Mass. 207, 209 (1989). The court must resolve doubts about the existence of a genuine issue of material fact against the moving party. Parent v. Stone & Webster Eng’g Corp., 408 Mass. 108, 112 (1990).
Defendants move for summary judgment on plaintiffs failure to warn claim, on grounds that Tysabri’s PML warnings were adequate and were not the proximate cause of Mrs. Gentile’s PML. Defendants additionally argue that summary judgment is appropriate with regard to the remaining claims based on the dismissal of plaintiffs failure to warn claim and that plaintiffs claims regarding the JCV antibody assay are preempted by federal regulation in the area.
B. Choice of Law
The parties do not dispute that there is a conflict between the pertinent laws of Massachusetts and New York, but disagree as to which law governs. I must apply “the conflict-of-laws rules of Massachusetts, the forum State, in order to determine which State’s law is applicable.” Clarendon Nat. Ins. Co. v. Arbella Mut. Ins. Co., 60 Mass.App.Ct. 492, 495 (2004). The Supreme Judicial Court has looked to the Restatement (Second) of Conflict of Laws (1971) as an “obvious source of guidance” to the courts when determining which law to apply. Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622, 632 (1985). Consistent with Section 146 of the Restatement (Second) of Conflict of Laws, Massachusetts law recognizes that “ordinarily ‘the substantive law governing an action of tort for physical injury is that of the place where the injury occurred.’ ” Cohen v. McDonnell Douglas Corp., 389 Mass. 327, 333-34 (1983), quoting Brogie v. Vogel, 348 Mass. 619, 621 (1965).
Here, plaintiff seeks to recover for harm that occurred in New York, where Mrs. Gentile resided, her treating physician worked, she received and acknowledged receiving various warnings about the risks of Tysabri treatment, and she was treated with Tysabri. Although plaintiff asserts that Biogen engaged in improper conduct (i.e. was headquartered) within the Commonwealth, this connection alone is not enough to defeat the presumption favoring New York law. See Restatement (Second) of Conflict of Laws §146. Therefore, New York law governs this case.
C. The Failure to Warn
Because of the centrality of the warnings to all of plaintiffs claims, I address the failure to warn claim first. In Count III, plaintiff claims that defendants failed adequately to warn of Tysabri’s PML risks. Defendants raise at least two arguments: that the warnings were adequate as a matter of law; and that plaintiff lacks admissible evidence to raise a genuine issue of material fact on the question of the adequacy of the warnings and on the causal link between any defect in the warnings and Mrs. Gentile developing PML.
*611 1. Adequacy of Warnings
To maintain a claim against a drug manufacturer for failure to warn, a plaintiff must establish “that the drug caused her injuiy and that the manufacturer breached a duty to warn of the possibility that the injurious reaction might occur.” Becker v. Cephalon, Inc., 2015 WL 5472311 at *5 (S.D.N.Y. Sept. 15, 2015), quoting Lindsay v. Ortho Pharm. Corp., 637 F.2d 87, 90-91 (2d Cir. 1980). This duty requires a manufacturer to provide adequate warnings “of all potential dangers which it knew, or in the exercise of reasonable care should have known, to exist.” Becker, 2015 WL 5472311 at *5, quoting Lindsay, 637 F.2d at 91.
Under New York’s “informed intermediary” principle, the warnings about a prescription drug “are intended for the physician, whose duty it is to balance the risks against the benefits of various drugs and treatments and to prescribe them and supervise their effects.” Martin v. Hacker, 83 N.Y.2d 1, 9 (1993). Therefore, under this principle, defendants had a duly to inform Dr. Guttman, as the prescribing physician, not Mrs. Gentile as the patient, of the PML risks associated with Tysabri. This duty did not impose on defendants an obligation to research and develop technologies to address the consequences or risks of taking the drug. The relevant question is whether Tysabri’s warnings were adequate to warn a physician of the precise malady Mrs. Gentile developed. See, e.g., McDowell v. Eli Lilly & Co., 58 F.Sup.3d 391, 403 (S.D.N.Y. 2014) (finding prescription drug warning “adequate as a matter of law”).
When evaluating the adequacy of a prescription drug warning, the court must consider the seriousness of the risk and “whether the warning is accurate, clear, consistent on its face, and whether it portrays with sufficient intensity the risk involved in taking the drug.” Martin, 83 N.Y.2d at 10-11. “A warning is clear if it is ‘direct, unequivocal and sufficiently forceful to convey the risk.’ ” McDowell, 58 F.Sup.3d at 403, quoting Martin, 83 N.Y.2d at 11. The warning must communicate “the precise malady incurred.” McDowell, 58 F.Sup.3d at 403, quoting Alston v. Caraco Pharm., Inc., 670 F.Sup.2d 279, 284 (S.D.N.Y. 2009). The warning must also be evaluated as a whole. As a result, any “vagueness” created by individual parts of the warning “may be overcome if, when read as a whole, the warning conveys a meaning as to the consequences that is unmistakable.” McDowell, 58 F.Sup.3d at 403, quoting Martin, 83 N.Y.2d at 12. “[W]hen a plaintiff claims to be injured in a manner that is addressed by warnings provided to his physician, summary judgment is granted on failure to warn claims.” Alston, 670 F.Sup.2d at 284.
Plaintiff contends that the PML warnings were inadequate because they did not fully inform patients and their physicians of the correlation between JCV antibodies and PML, or the risks associated with duration of treatment or prior immunosuppressant treatment. Defendants argue that, to the contrary, Tysabri’s PML warnings were adequate as a matter of law because they accurately stated what defendants knew at the time, i.e., that Tysabri increased the risk of PML. Defendants further contend that the warnings were sufficient even though they did not include the correlation between JCV antibodies and PML, or the risk associated with duration of treatment and immu-nosuppressant exposure, because defendants had no duty to instruct physicians on basic medical concepts or practices, to warn patients directly, or to develop and commercialize a JCV antibody assay.
Because PML may lead to death or severe disability, the warnings should have been commensurate with a high level of risk. See Martin, 83 N.Y.2d at 11. The black box warning in effect when Dr. Guttman first prescribed Tysabri to Mrs. Gentile explicitly warned against the precise risk (developing PML) that Mrs. Gentile ultimately suffered, and fully disclosed the serious consequences of that disease. See, e.g., Fane v. Zimmer, Inc., 927 F.2d 124, 130 (2d Cir. 1991) (device manufacturer included adequate warnings against type of breakage suffered by plaintiff); Alston, 670 F.Sup.2d at 284-85 (duly discharged “by providing express warnings about the injuries allegedly sustained by Plaintiff’); Martin, 83 N.Y.2d at 15 (drug manufacturer “established that the [drug] package insert contains language which, on its face, adequately warns against the precise risk in question”).
Dr. Guttman’s testimony that she was aware that Tysabri increased a patient’s risk of developing PML further demonstrates the adequacy of the warning. See Fane, 927 F.2d at 130 (in finding warnings adequate to convey risk, court considered that plaintiffs treating doctor “was fully aware of these risks”).
Failure to reference certain risk factors did not undermine the accuracy, clarity, or intensity of the PML warnings because even without these useful details, when read as a whole, the warnings unmistakably conveyed the seriousness of PML and its association with Tysabri treatment. See McDowell, 58 F.Sup.3d at 405 (“[C]ourts have refused to graft onto the adequacy standard a requirement that a package insert must include specific adverse event frequencies”). The warnings unambiguously assumed that anyone who took Tysabri increased their risk of developing PML, and as a result, Dr. Guttman knew the risk existed when she prescribed Tysabri for Mrs. Gentile. Although plaintiff contends that the risk factors would have been useful to Dr. Guttman, the fact that these uncertainties existed was indicated in the PML warnings and should have been considered by Dr. Guttman when balancing the risks and benefits of prescribing Tysabri to Mrs. Gentile. See Martin, 83 N.Y.2d at 9. Tysabri’s PML warnings were adequate as a matter of law.
2. Plaintiffs Expert Testimony
Even if defendants had failed to establish Tysabri’s PML warnings were adequate as a matter of law, the Court, nonetheless, would grant defendants summary *612 judgment because plaintiff has failed to provide evidence establishing that a genuine issue of material fact exists regarding the adequacy of the warnings.
“Ordinarily, expert medical opinion evidence ... is required, when the subject-matter to be inquired about is presumed not to be within common knowledge and experience.” Fane, 927 F.2d at 131, quoting Meiselman v. Crown Heights Hosp., 285 N.Y. 389, 396 (1941) (quotations omitted). When evaluating failure to warn claims, the court must “(ajlways bear [ ] in mind that the warning is to be read and understood by physicians, not laypersons.” Martin, 83 N.Y.2d at 10. Because the adequacy of the warnings cannot be evaluated by a layperson, expert testimony is necessary to resolve the issue. See Calisi v. Abbott Labs., 2013 WL 5441355 at *8 (D.Mass. Sept. 27, 2013) (expert’s opinion unreliable and summary judgment appropriate; expert did not possess “sufficient basis for understanding what information is needed by a doctor in making his or her prescribing decision").
In the present case, plaintiff offers the testimony of Dr. Eugene Major (“Dr. Major”), who has extensive research experience in the area of diagnostic and assay development for viruses and antibodies, including JCV antibody assays. Plaintiff offers Dr. Major’s testimony to establish that at the time Mrs. Gentile began to receive Tysabri infusions defendants were aware or should have been aware of certain options available for assessing a person’s propensity to developing PML. Specifically, Dr. Major establishes that Biogen knew or should have known that patients who had been exposed to JCV were at a higher risk of developing PML; the human body will create antibodies in response to exposure to JCV; such antibodies are detectable through diagnostic testing; defendants knew as early as March 2005 that an ELISA assay for JCV existed; and publicly available technology existed to detect the presence of JCV antibodies.
Dr. Major’s opinion, if accepted as true, establishes that defendants did not efficiently investigate risk factors that could have been revealed sooner. Dr. Maj or stated in his deposition that “(i]t would therefore have been prudent for Biogen to communicate to physicians, healthcare providers and patients that the [JCV] Antibody test might be useful in helping to assess a higher risk of PML.” This evidence does not support an argument that the warnings were inadequate to caution a physician that a risk of PML existed. Indeed, Dr. Major stated he was “not familiar with the requirements for labeling for prescription drug.” Dr. Maj or is not a medical doctor, does not have the qualifications necessary to opine on matters of treating patients, and does not assert that he has the experience necessary to interpret warnings from the perspective of a prescribing physician. See Calisi, 2013 WL 5441355 at *8. Therefore, even if Dr. Major were prepared to testify about the adequacy of the warnings, his opinion would be inadmissible.
Because Dr. Major’s testimony does not create a dispute of material fact regarding whether Tysabri’s warnings were adequate to convey to a prescribing physician the risk of developing PML, plaintiff has failed to establish an entitlement to relief on his failure to warn claim.
3. Proximate Cause
Even if plaintiff were able to demonstrate a defect in Tysabri’s PML warnings, summary judgment is appropriate because plaintiff cannot establish that the warnings (or any omission from those warnings) caused Mrs. Gentile’s PML. To succeed on a failure to warn claim, a plaintiff must prove that “defendant’s failure to warn was a proximate cause of his injury.” Alston, 670 F.Sup.2d at 285, quoting Sosna v. American Home Products, 298 A.D.2d 158, 158 (1st Dept. 2002). “In the case of prescription medications, where warnings are directed to prescribing physicians, a plaintiff must demonstrate that had a different, more accurate warnings [sic] been given, his physician would not have prescribed the drug in the same manner.” Alston, 670 F.Sup.2d at 285 (and cases cited).
Plaintiff argues that if defendants had warned of the risks associated with duration of treatment and immu-nosuppressant exposure, and of the correlation between JCV antibodies and PML, then Dr. Guttman would not have prescribed Tfysabri in the same way to Mrs. Gentile. The evidence supports the contrary conclusion—Dr. Guttman would have prescribed Tysabri regardless of this information. Dr. Guttman testified that her decision to prescribe Tysabri to Mrs. Gentile would not have changed even if the warnings cautioned against the risk associated with the duration of Tysabri use. Dr. Guttman testified that she was “thinking it anyway.” In addition, although Dr. Guttman indicated that she was unaware that prior immunosuppressant use increased a Tysabri user’s risk of developing PML, she nonetheless stated that knowledge of this risk would not have changed her decision. Dr. Guttman knew JCV caused PML and that the presence of certain JCV antibodies suggested that the patient might develop PML. Because the technology at the time could not provide who was at a higher risk of developing PML based on the presence of JCV antibodies, Dr. Guttman did not use this correlation in her decision to prescribe Tysabri to Mrs. Gentile. Rather, Dr. Guttman stated that she would have changed her procedure by discontinuing treatment after two years had the JCV assay that Biogen later developed been available at the time.
As Dr. Guttman indicated in her deposition, the absence of warnings about the three risk factors—duration of treatment, prior exposure to immunosuppres-sants, and PML correlation with JCV antibodies—would not have altered her decision to prescribe Tysabri to Mrs. Gentile. At most, Dr. Guttman’s testimony creates a factual issue about whether she would have discontinued Mrs. Gentile’s use of Tysabri after two years if a JCV assay had been available and Mrs. Gentile had tested positive. The unavailabilily of technology, how *613 ever, does not fall within a failure to warn claim, which evaluates whether the information provided was sufficient to caution against the injury at issue. For this reason, too, summary judgment as to plaintiffs failure to warn claim is appropriate because there is no evidence that defendants’ conduct was the proximate cause of Mrs. Gentile’s PML.
D.Negligent Undertaking
In Count II, plaintiff asserts that defendants assumed a duly to warn plaintiff directly when they provided plaintiff with information, warnings, and acknowledgment forms.[5] As I have already explained, under New York law a prescription drug manufacturer’s duty to provide adequate warning extends to the prescribing physician, not to the patient directly. See, supra, at 10, 12. Citing to Calisi, plaintiff argues that an exception to the informed intermediaiy doctrine exists where a drug manufacturer voluntarily assumes the duty to inform the patient directly through informative brochures or videos. In Calisi, the court chose to “assume without deciding that a Massachusetts court would apply the voluntary assumption of duty doctrine to a drug manufacturer,” 2013 WL 5441355 at *3 (internal citations omitted),[6] but held that a drug manufacturer did not voluntarily assume such a duty by creating an informative video on the drug because, among other reasons, the patient’s treating physician provided her with the video. Id. at *4, citing to Seley v. G.D. Searle & Co., 67 Ohio St.2d 192, 203 (1981) (drug manufacturer did not voluntarily assume duly to warn patient directly because “a direct relationship between the manufacturer and the patient does not arise as a result of the provision of [ ] brochures”; patient “did not receive the allegedly deficient informational material directly from the manufacturer, but from her doctor”). Here, plaintiff cannot prove defendants voluntarily assumed a duly to warn Mrs. Gentile by providing her with information directly, and not through her doctor. Moreover, even if the Court were to extend the manufacturer’s duly to warn to Mrs. Gentile, the Court has already determined that the warnings were adequate as a matter of law. Summary judgment shall therefore enter for defendants on the negligent undertaking claim.
E.The Remaining Claims (Counts I and IV-IX)
Citing Massachusetts law, plaintiff argues that his remaining claims are separate and independent from his failure to warn claim. However, under New York law, where a failure to warn claim cannot succeed, the court must dismiss any related claims for negligence, strict liability, breach of warranties, or fraud. McDowell, 58 F.Sup.3d at 410 (remaining claims of defective design, negligence, breach of implied warranty, negligent misrepresentation, fraud, and violation of consumer fraud laws barred by adequacy of warning). See also In re Accutane Prods. Liab., 2012 WL 3194954 at *6 (M.D.Fla. Jul. 24, 2012) (applying New York law). Moreover, “New York does not recognize a design defect theory of liability for prescription medicines,” McDowell, 58 Sup.3d at 410, because “a prescription drug, accompanied by adequate warnings, is ‘not defective, nor is it unreasonably dangerous.’ ” Martin, 83 N.Y.2d at 8, quoting Wolfgruber v. Upjohn Co., 72 A.D.2d 59, 61 (1979), aff'd, 52 N.Y.2d 768 (1980). For these reasons, summary judgment will be granted in favor of defendants on Counts I and IV-IX.
F. Preemption
Defendants argue they are also entitled to summary judgment, because plaintiffs claims, insofar as they are based on either defendants’ failure to warn of the correlation between PML and JCV antibodies, or against Elan, are preempted by federal law and regulations.
When state and federal law directly conflict, federal law triumphs under the Supremacy Clause of the United States Constitution. PLIVA, Inc. v. Mensing, 564 U.S. 604, 617-18 (2011). In the context of drug labels, state law is preempted where “it was impossible for the Manufacturers to comply with both their state-law duty to change the label and their federal law duty to keep the label the same.” Id. at 618. The FDA must approve a manufacturer’s proposed changes to a prescription drug’s labeling “to reflect newly acquired information,” including “(t]o add or strengthen a contraindication, warning, precaution, or adverse reaction.” 21 C.F.R §§314.70(c)(l), (c)(6)(iii). “If the agency disapproves the supplemental application, it may order the manufacturer to cease distribution of the drug product(s) made with the manufacturing change.” 21 C.F.R. §314.70(c)(7).
In the present case, the FDA’s decision to reject the proposed modifications regarding risks associated with providing Tysabri to patients with the JCV antibody demonstrates that prior to Mrs. Gentile’s diagnosis, defendants could not have strengthened their warnings to comply with state law without violating the FDA’s decision. See PLIVA, Inc., 564 U.S. at 617-19 (manufacturers would have violated federal requirement that generic drug labels match corresponding brand-name drug labels if they changed generic labels to satisfy state-law duty); Wyeth v. Levine, 555 U.S. 555, 571 (2009) (impossibility occurs where evidence demonstrates FDA would not have approved label change); Rheinfrank v. Abbott Labs., Inc., 119 F.Sup.3d 749, 766 (S.D. Ohio 2015) (FDA would have rejected added warning in 2003 when the plaintiff used drug, considering FDA twice rejected change in subsequent fewyears). See also Reckis v. Johnson & Johnson, 471 Mass. 272, 283-91 (2015) (discussing conflict preemption in the context of over-the-counter drug warnings).
Citing Aaron v. Wyeth, 2010 WL653984 at *6 (W.D.Pa. Feb. 19, 2010), plaintiff contends defendants could have made advances sooner concerning the correlation between the presence of JCV antibodies and the development of PML in Tysabri users; and therefore, the FDA’s rejection of the proposed changes to the warnings was not clear evidence of impossibility. In Aaron, however, the court found the drug manufacturer “did not press its position” and “instead acquiesced to the requests made *614 by the FDA.” Id. This case differs. Defendants continued to research the JCV antibody correlation until the FDA finally approved the modified warning. Plaintiffs argument that defendants could have reworded the warning to gain FDA approval is unavailing. Here, FDA rejected defendants’ proposed change in the warning not because of the language used, but because the supporting data was not yet sufficiently persuasive. See, e.g., Cerveny v. Aventis, Inc., 2016 WL 1065826 at **8-13 (D.Utah Mar. 16, 2016). For this reason, summary judgment is further appropriate, at least in part, because plaintiffs claims, insofar as they are based on defendants’ allegedly inadequate warnings about the risks of administering Tysabri to patients who are found to have JCV antibodies, are preempted by federal law.
Defendants briefly argue that any failure to warn claims asserted against Elan, which distributed Tysabri, are preempted for the similar reason that 21 C.F.R. §314.70 does not allow Elan to modify, or to seek FDA approval for the modification of, the Tysabri label. Biogen is the holder of the original, approved application for Tysabri. Consequently, Elan could not have sought modifications of the label. See In re Fosamax Prods. Liab. Litig. (No. II), 2012 WL 181411 at *3 (D.N.J. Jan. 17, 2012) (drug distributor “has no power to change [drug] labeling”; “(t]hat power lies with the applicant who filed the [application] to market [the drug,]”; 21 C.F.R. §314.70 “requires that ‘the applicant must notify FDA about each change in each condition established in an approved application’ ” (emphasis in original)). Plaintiffs failure to warn claim against Elan is therefore preempted.
II. The Motion to Amend
Plaintiff seeks to amend his Second Amend Complaint to assert additional facts bearing on the negligent undertaking claim. Specifically, he seeks to add newly discovered information to change or supplement his theory of negligent undertaking from a failure to warn plaintiff to a general failure to develop a JCV antibody assay fast enough.
Leave to amend a complaint “shall be freely given when justice so requires." Mass.R.Civ.P. 15(a). As the Supreme Judicial Court has long recognized, “leave should be granted unless there appears some good reason for denying the motion.” Goulet v. Whitin Mach. Works Inc., 399 Mass. 547, 549 (1987), quoting Castellucci v. United States Fid. & Guar. Co., 372 Mass. 288, 289 (1977). Good reasons “include ‘undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ...[,] futility of amendment, etc.’ ” Goulet, 399 Mass. at 549-50, quoting Castellucci, 372 Mass. at 290. See also Lipsitt v. Plaud, 466 Mass. 240, 254 (2013); North American Expositions Company Limited Partnership v. Corcoran, 452 Mass. 852, 871 (2009) (upholding denial of motion to amend as futile because requested amended pleading did not allege necessary element).
The late addition of this proposed new theory would substantially prejudice defendant at a time long after discovery has closed. Plaintiff has known for more than a year (and before seeking leave to file his Second Amended Complaint) about Biogen’s access to NIH’s JCV antibody assay in 2005. Indeed, the report produced in January 2015 by plaintiffs own expert, Dr. Major, who led the laboratory that developed the JCV antibody assay, disclosed this information.
Even assuming plaintiff gets beyond the issues of prejudice and untimeliness, I deny plaintiff leave to amend because his amendment would be futile. In analyzing the question of futility, the issue is not whether there has been “futility in prior amendments,” as plaintiff argues at page 10 of his Memorandum on Law in Support of Plaintiff s Motion for Leave to Amend Second Amended Complaint.[7] The issue is whether the new allegations would be sufficient to state a cause of action against defendants for failing to develop a commercially viable JCV antibody assay. Plaintiff cites no case to suggest the viability of such a novel cause of action. Plaintiff cites Cottam v. CVS Pharmacy, 436 Mass. 316 (2002), for the proposition that Massachusetts recognizes a cause of action based on a person’s voluntary assumption of a duty to render services to another, which may then be enforced if negligently performed. 436 Mass. at 323-24. Cottam involved a pharmacy’s choice to provide information to individual customers. It did not involve the development of a product that might be generally available in the market if its efficacy could be demonstrated and if the FDA approved it.
ORDER
Defendants’ Joint Motion for Summary Judgment (Docket #66) is ALLOWED. Plaintiffs Motion for Leave to Amend Second Amended Complaint (Docket #64) is DENIED. Judgment shall enter for defendants accordingly.

 The parties dispute the state of the research about the precise percentage of the population that had been exposed to JCV at the time Dr. Guttman prescribed Tysabri for Mrs. Gentile. This dispute is not material to my analysis.

 In April 2005, Biogen announced that a third clinical trial patient had developed PML. This patient, who was treated in Belgium, had been prescribed Tysabri to treat Crohn’s disease.

 Plaintiff also argues defendants voluntarily assumed and breached a duty to develop and commercialize a JCV antibody assay. Because plaintiff did not assert this claim in his complaint, I do not consider it. But see, infra, at 20-21.

 Although I apply New York law, plaintiff does not provide, nor was I able to find, any New York case support for his argument.

 See also Memorandum on Law in Support of Plaintiffs Motion for Leave to Amend Second Amended Complaint at 10-11 (“Therefore, the Court should not find that Plaintiffs Motion is based on any undue delay, bad faith, or the futility of any prior amendments." (Emphasis added)).