HogaN, Maureen B., J.
The plaintiff SimpliVily Corporation (“SimpliVity”) brings this action to enforce confidentiality and non-competition provisions of a Proprietary Information and Inventions Agreement signed by its former employee, the defendant Keith Moran (“Moran”), as a condition of his employment.[1] The matter is before the court on SimpliVity’s motion for a preliminary injunction. After hearing and consideration of the verified complaint, the affidavits of Jakob Wahlberge, and the affidavit of Moran, as well as the attached exhibits, * for the following reasons, the motion will be ALLOWED.
BACKGROUND
The following facts were obtained from the verified complaint, the affidavits, and exhibits submitted by the parties.
SimpliVity is a start-up corporation which develops and sells converged IT infrastructure and software defined data center products in the markets of the information technology and services industry. Simpli-Vity was established in 2009, but did not formally launch its innovative converged IT infrastructure products into the information technology market until September 2012.[2] SimpliVity’s products are designed to simplify IT for businesses by converging a number of functionalities of numerous disparate products, including server, storage, IT protection and management, into “all in one” products. SimpliVity is a leader in the market for converged IT infrastructure products. SimpliVily sells its products to small, medium and large for-profit and non-profit civilian and government entities all over the world. SimpliVily’s products have received broad market acceptance due to their technical superiority to competing products and the team of sales professionals at SimpliVily who market and sell these products.
The IT infrastructure and data storage industry is highly competitive. SimpliVity competes with many companies, such as EMC, VCE (a joint venture of EMC and Cisco), Hewlett Packard, and Dell, but its direct and primary competitor is another start-up company, Nutanix. Like SimpliVity, Nutanix also develops and sells converged IT infrastructure and software defined data center products in the same markets as Simpli-vity. Both SimpliVily and Nutanix pursue the same target customers, pursue the same type of resellers and partners, and present a very similar set of value propositions, marketing tactics, and themes to customers. Both Nutanix and SimpliVily refer to themselves as direct competitors in their marketing materials, on blogs and through social media. Customers, partners, and the media also view and refer to Simpli-Vity and Nutanix as direct competitors.
To maintain a competitive advantage in this highly competitive and rapidly developing market, SimpliVity expends substantial resources and effort to train its employees and to safeguard and protect its confidential information. SimpliVity password protects its computers, requires employees to sign non-disclosure agreements, restricts employee access to confidential information, and employs physical security measures at its offices. In order to protect its patentable, trade secret and confidential information, as well as its customer and employee relationships, SimpliVity requires employees to sign Proprietary Information and Inventions Agreements.
Moran began working for SimpliVily on or about April 29, 2013 as a Regional Sales Director, shortly *588 after SimpliVity introduced its innovative products into the IT market. Prior to working for SimpliVity, Moran was employed as a salesperson by two companies, EMC and NetApp, which sell data storage products and services in the markets of the information technology and services industiy. Moran began working for EMC in 2003. For the first nine months, he performed inside sales work and attended EMC’s training program, where he learned how the data storage industiy worked. He next worked for EMC for approximately two years in the San Francisco Bay area, selling data storage products and services. Moran left EMC in 2006 and joined NetApp as a salesperson in the Illinois area. He worked with NetA-pp until he joined SimpliViiy in April 2013. One year before he left NetApp, he was promoted to Regional Sales Manager with a sales territoiy that covered the upper Midwest, including Illinois and Indiana.
During the ten years Moran worked in the data storage industiy prior to joining SimpliViiy, Moran developed a network of IT professionals involved in the data storage industiy with whom he developed relationships. Such IT professionals included buyers of data storage product, individuals who make referrals to buyers of data storage products, and business partners who are referred to as value added resellers— companies that sell IT infrastructure products. Such business partners make recommendations and introductions to buyers of data storage products. Moran’s relationships with business partners was a key source of customers for him. Moran also found new customers through Trade Shows and on-line databases. When Moran joined SimpliVity, he was asked to tap into the network of IT professionals he had developed to find customers and employees for SimpliVity. The relationships Moran has with such IT professionals make him a valuable salesperson.
When Moran started with SimpliVity on April 29, 2013 as a Regional Sales Director, he was responsible for developing SimpliVity’s business in five states in the Midwest region of the United States. Moran was promoted in the third quarter of 2013 to a position where he managed SimpliVity’s sales for eighteen states. In the second quarter of 2014, Moran was again promoted to Director of Midwest Sales, in which position he was responsible for SimpliVity’s sales for the entire Midwest, Central, Plains and Texas regions of the United States, as well as the Central Canadian Territoiy, which included 19 states and two Canadian provinces. In this position, Moran supervised nine SimpliVity employees.
On April 29, 2013, as a condition of his employment, Moran entered into a Proprietary Information and Inventions Agreement (the “Agreement”) with SimpliViiy. By agreeing to the terms of this Agreement, Moran agreed that the Agreement was “a material part of the consideration of my employment and continued employment by” SimpliViiy. By signing this Agreement, Moran agreed to the following non-solicitation and non-competition restrictions, provided in Section 4(d) of the Agreement:
After Termination
For the period of one year immediately following termination of my employment with the Company (for any or no reason, whether voluntary or involuntary), I will not directly or indirectly: (i) Cause any person to leave their employment with the Company; (ii) Cause any person who was employed by the Company during the last six months to become an employee of mine or a third party; (iii) Solicit any Business Partner; or (iv) Act in Any Capacity in or with respect to any Competing Business located within the Commonwealth of Massachusetts, the rest of the region known as New England, the rest of the United States, or anywhere else in the world.
Section 4(c) of the Agreement defines “Competing Business” as “any commercial activity which competes or is reasonably likely to compete with any business that the Company conducts, or demonstrably anticipates conducting, at any time during my employment.” Section 4(a) of the Agreement also defines other relevant terms:
Definitions
Any Capacity includes, without limitation, to (i) be an owner, founder, shareholder, partner, member, advisor, director, consultant, contractor, agent, employee, affiliate or co-venturer, (ii) otherwise invest, engage or participate in, (iii) be compensated by, or (iv) prepare to be or do any of the foregoing or assist any third party to do so; provided, Any Capacity will not include being a holder of less than one percent (1%) of the outstanding equity of a public company. Business Partner means any past, present or prospective customer, vendor, supplier, distributor or other business partner of the Company with which I have contact during my employment. Cause means to recruit, employ, retain or otherwise solicit, induce or influence (or to attempt to do so). Soiicitmeans to (i) service, take orders from or solicit the business or patronage of any Business Partner for myself or any other person or entity, (ii) divert, entice or otherwise take away from the Company the business or patronage of any Business Partner, or to attempt to do so, or (iii) to solicit, induce or encourage any Business Partner to terminate or reduce its relationship with the company.
In Section 3 of the Agreement, Moran “agree[d] that all Assigned Inventions and all other business, technical and financial information, including the identity of and information relating to the company’s employees, Affiliates and Business Partners (as such terms are defined below), which I develop, learn or obtain during my employment that relate to the Company or the business or demonstrably anticipated business of the Company, or that are received by or for the Company in confidence, constitute Proprietary Informa- *589 tton.” Moran further agreed to “hold in confidence and not disclose or, except within the scope of my employment, use any Proprietary Information” and upon termination of his employment “to promptly return to the company all items containing or embodying Proprietary Information ...”
In Section 4(b) of the Agreement, Moran “acknowledge[d] and agree[d] that (i) the Company’s business is highly competitive, secrecy of the Proprietary Information is of the utmost importance to the Company and that [he] will learn and use Proprietary Information in performing [his] work for the Company.” He further acknowledged that his “position may require [him] to establish goodwill with Business Partners and employees on behalf of the Company and such goodwill is extremely important to the Company’s success.” In Section 4(e) of the Agreement, Moran further agreed that he understood that the restrictions set forth in section 4, namely the non-solicitation and non-competition restrictions, “are intended to protect the company’s interest in its Proprietary Information and established relationships and goodwill with employees and Business Partners” and he agreed that such restrictions “(i) are reasonable and appropriate for this purpose, and (ii) shall continue in full force and effect even if I am promoted and/or the title of my position at the Company changes.”
Finally, Moran further agreed that he understood that “any breach or threatened breach of this Agreement will cause irreparable harm to the Company for which damages would not be an adequate remedy, and, therefore, the Company will be entitled to injunc-tive relief with respect thereto (without the necessity of posting any bond) in addition to any other remedies.”
In his Director of Sales positions at SimpliVity, Moran was responsible for creating market strategy, promoting brand awareness of SimpliVity’s products to its customers and partners, developing business and creating opportunities for SimpliVity, overseeing sales pipeline information and sales forecasting, and devising strategies on SimpliViiy’s pricing, product messaging, partner strategy and sales acquisition. Moran reported to and worked closely with SimpliViiy’s Vice President of Sales. Moran frequently was involved in high-level discussions regarding SimpliVity strategy, objectives and operations related to sales of SimpliVity’s products with SimpliViiy’s key executives, including the CEO, VP Marketing, VP Worldwide Sales, VP Sales Americas, Worldwide VP Alliance, VP Customer Support, and Worldwide Director of Sales Operations. Moran participated in developing the direction of SimpliVity by providing strategic input on key operational and sales strategies, such as product direction, channel development, product messaging, sales growth, and planning.
Involved in these high-level discussions and development of SimpliVity strategy, Moran learned confidential and commercially sensitive information about SimpliViiy’s business, customers, employees and its long-term strategic plans. He was entrusted with information concerning SimpliViiy’s confidential business plans, customer and partner lists, competitive intelligence briefs, marketing strategies, product development, product offerings, pricing structures, solicitation methods and training protocols. While Moran asserts that he is not an engineer and does not have deep knowledge of the patents or intellectual property concerning data storage and server equipment of SimpliVity, he admits in his affidavit that “[l]ike any salesperson, I need to develop a deep knowledge of the products I am selling, how it works, its features and capabilities.” He claims, however, that such information is publicly disclosed and known in the industry.
Moran was also involved in recruiting, hiring, and training SimpliVity’s sales representatives, -with whom he developed professional and personal relationships. Responsible for many of SimpliViiy’s key accounts, Moran developed relationships with SimpliVity customers. Moran made sales calls and presentations to customers and provided follow up service for customers after sales were made. He had access to competitively sensitive business information developed and used by SimpliVity for specific accounts, knowledge of ongoing and potential customer relationships, and knowledge of individual customer’s use of SimpliVity products and information, and their level of satisfaction with such products. Moran also developed relationships with SimpliVity’s strategic partners.
Without prior notice, on June 13, 2014, Moran informed SimpliVity that he was resigning and he left his employment with SimpliVity on that same day. Within days, SimpliVity learned that Moran had started working for its direct and primary competitor, Nutanix. Moran is currently employed by Nutanix as Area director, Central United States Sales, in which position he is responsible for managing Nutanix’s Midwest sale territory, which is the same territory he covered when employed by SimpliVily.
Jakob Wahlberg, a computer forensic analyst at Elysium Digital LLC (“forensic analyst”), conducted a forensic examination of Moran’s SimpliVity laptop, which revealed information that Moran had been planning to leave SimpliVity for months prior to June 13, 2014. Moran started researching Nutanix and Nutanix employees in February 2014. On or about April 16, 2014, Moran ran internet searches for “questions to ask Nutanix” and “good questions to ask in an interview” which reveals he was planning to interview with Nutanix. Moran states in his affidavit that he interviewed with Nutanix on April 18, 2014. While planning to leave SimpliVily and engaged in efforts to become employed by Nutanix, Moran actively participated in internal strategic discussions at SimpliVily about how *590 to compete with Nutanix in the marketplace. In or around April 29, 2014 through May 1, 2014, Moran participated in two separate SimpliVity Quarterly Business Reviews in which SimpliVity employees engaged in extensive discussion about how to position SimpliVity products against Nutanix products. Between mid-April and June 13, 2014, Moran also received emails from sales representatives which discussed sensitive competitive information comparing SimpliVity products' to Nutanix products and which suggested responses to customers who asked questions about Nutanix. On his last day, June 13, 2014, Moran received, opened and viewed an email sent to SimpliVity’s sales employees relaying confidential information received from a customer describing that customer’s opinion about Nutanix. Attached to this email was SimpliVity’s most up-to-date “battle card,” by which SimpliVity directs its sales employees on how to sell SimpliVity against Nutanix, as well as SimpliVity’s most up-to-date Nutanix competitive brief.
Moran was also aware that he would be violating the non-competition provision in the Agreement by going to work for Nutanix. On April 14, 2014, before his interview with Nutanix, he wrote a note to himself, stating “non-compete in contract sue me.” Also, a draft of a resignation letter on his computer made assurances that he would not violate the Proprietary Information and Inventions Agreement. The actual resignation letter he submitted, however, did not contain such assurances, but rather simply stated he was resigning immediately. Additionally, on his last day of employment with SimpliViiy, Moran reviewed a number of articles regarding the enforceability of non-competes in Massachusetts.
The forensic analysis of Moran’s computer also showed that Moran emailed himself one confidential SimpliVity document on October 4, 2013, a Microsoft PowerPoint presentation entitled “SimpliViiy Introduction,” which contained a detailed discussion of SimpliVity’s products and services, including key functionality and components of those products. In the Verified Complaint, Mitch Breen, Senior Vice President, Global Sales, states that Moran has not returned this document to SimpliVity. In his affidavit, Moran explains that he emailed this presentation to his personal email to enable him to download it to his Ipad, which he then used to show the PowerPoint presentation to customers at trade shows. Moran claims that the information in this presentation is not confidential and was shared with potential customers and partners and even on YouTube. He states that the information in the presentation he emailed to himself on October 4, 2013 is outdated and that he returned a marked up copy of it to SimpliViiy upon his resignation.
The forensic analysis of Moran’s laptop also revealed that during his employment Moran plugged into his SimpliViiy laptop fifteen different external USB storage devices and three external printing devices. Two of the USB storage devices contain storage capacity of 500 GB or larger. The forensic analyst can not determine what, if any, files Moran printed from or transferred to any USB devices without examining such devices or a forensic image thereof. Significantly, however, the forensic analyst found that Moran did not download anything onto the laptop from any of the USB storage devices he connected to the laptop. Additionally, the forensic analysis revealed that Moran generated and downloaded to his laptop six Salesforce reports on three dates: April 23, 2014, April 24, 2014, and May 9, 2014. “Salesforce” is a Customer Relation Management tool used by SimpliViiy and other companies to assist sales departments with tracking current customers, as well as sales leads and other sales-force information.
Moran affirms in his affidavit that when he left SimpliViiy, he returned all materials concerning his work with SimpliViiy, including personal notes that he took when working for SimpliVity. He also affirms that he did not copy any SimpliVity documents. Moran denies ever having downloaded or printed or emailed any SimpliVity confidential information in anticipation of his joining Nutanix. He also states that he never shared any SimpliVity confidential documents with anyone at Nutanix. Further, he affirms that he has not accessed, used, copied, transferred or disclosed any of the documents or files related to SimpliVity that are stored on any external devices.
Moran further explains that many of the USB devices were attached to his laptop for business reasons, specifically to give presentations, and to print documents, all of which he affirms he returned to Simpli-Vity in boxes. He further explains that several devices were connected for personal reasons, such as downloading personal photographs from the laptop and viewing blueprints for his house. Moran states that he or others had downloaded information from several USB devices to his laptop, such as his contacts and business information which he brought with him to SimpliVity. Such statements, however, conflict with the forensic analyst’s determination that no information or documents were downloaded to the laptop from the external devices. Moran also affirms that the only time he transferred a document to a USB device was when he copied his updated resume onto the USB device on April 14, 2014 to enable him to bring it to his interview with Nutanix. Moran states that he had previously loaded his resume onto the laptop from the USB device, which statement again conflicts with the forensic analyst’s finding that no documents were loaded onto the laptop from the external USB devices.
In his affidavit, Moran explains that he left Simpli-Viiy because his compensation was not what he was promised or what he expected it to be. He states that at SimpliVity he was paid $140,016.00 for eight *591 months from May through December 2013 and that his total gross earnings for 2014 as of the date of his resignation was $86,368.78. Such compensation was significantly less that his earnings at NetApp, his previous employer, where his gross income for 2012 was $414,264.00 and his gross income for less than four months in 2013 was $246,577.00. Moran informed Nutanix that he had signed a non-competition agreement with SimpliVity. He states that before beginning his employment with Nutanix, he agreed with Nutanix that he would not use or disclose SimpliVity proprietary information in the course of his job duties managing Nutanix’s Midwest sales territory, and that he would not retain any such information. He affirms that he and Nutanix also agreed that he would not solicit or do business with any of SimpliVity’s customers that he worked with while at SimpliVity. He states that since joining Nutanix, he has been walled off from two sales pitches where SimpliVity is also involved, even though the customers are also looking at other vendors, including NetApp, VCE and Hewlett Packard.
Despite Moran’s affirmation that he returned all SimpliVity materials to SimpliVity when he left his employment, after the hearing on this motion, by letter dated July 22, 2014, Moran’s counsel sent to SimpliVity’s counsel several SimpliVity documents, which Moran had located upon further search for SimpliVity materials. SimpliVity’s counsel informed the court by letter that such documents included 1) portions of a slide deck, marked “SimpliVity Confidential and Proprietary, discussing the SimpliVity sales process; 2) a SimpliVity product evaluation agreement with a customer signed and dated on May 23, 2014; 3) a sales pipeline report identifying sales opportunities, next steps, deal value, and other relevant data for specific sales opportunities; and 4) reports of specific customer meetings which are labeled ’’Confidential Information—Do Not Distribute."
DISCUSSION
SimpliVity has moved for a preliminary injunction (1) ordering Moran to cease his employment with Nutanix and enjoining Moran from being employed by or performing services for Nutanix for one year from the date his employment ended (i.e., the period from June 13, 2014 through June 12, 2015); (2) enjoining Moran from using or disclosing SimpliVity’s Proprietary information, as defined in the Agreement; (3) ordering Moran to immediately identify and return all SimpliVity Proprietary Information or copies thereof in his possession, custody or control; (4) ordering Moran to immediately produce to SimpliVity the USB devices for SimpliVity’s inspection, review and removal of SimpliVity’s Proprietary Information; (5) ordering Moran to identify the physical and/or electronic locations where all SimpliVity Proprietary Information controlled by Moran resided following his resignation from SimpliVity (including recipients of SimpliVity Proprietary Information and date of transmittal); (6) ordering Moran to verify that (i) all SimpliVity Proprietary Information has been returned to SimpliVity, (ii) no Proprietary Information has been retained by Moran, and (iii) no SimpliVity Proprietary Information in Moran’s possession, custody or control has been deleted or destroyed; and (7) if any SimpliVity Proprietary Information in Moran’s possession, custody or control has been deleted or destroyed in the past 30 days, ordering Moran to produce a log to SimpliVity describing each deleted or destroyed item.
In order to obtain a preliminary injunction, Simpli-Vity must show: (1) a likelihood of success on the merits; (2) that irreparable harm will result from denial of the injunction; and (3) that, in light of SimpliVity’s likelihood of success on the merits, the risk of irreparable harm to SimpliVity outweighs the potential harm to Moran in granting the injunction. GTE Products Corp. v. Stewart, 414 Mass. 721, 722-23 (1993); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980).
I. Likelihood of Success on the Merits
Covenants not to compete, which generally include covenants not to work for a competitor, not to solicit customers of the former employer, and not to use confidential or proprietary information, are enforceable if they are necessary to protect a legitimate business interest of the employer and based upon all of the circumstances, they are reasonable in geographic and temporal scope. Boulanger v. Dunkin' Donuts, 442 Mass. 635, 639 (2004); All Stainless, Inc. v. Colby, 364 Mass. 773, 779-80 (1974); Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 287-88 (1974). Trade secrets, confidential information and an employer’s good will are legitimate business interests which may be protected through enforcement of covenants not to compete. All Stainless, Inc., 364 Mass. at 779-80. Good will is generally understood to refer to the benefit and advantage that accrue to a business from its positive reputation in the eyes of its customers and potential customers that enable it to retain their patronage and obtain new business. North Am. Expositions Co., Ltd. P’ship v. Corcoran, 452 Mass. 852, 869-70 (2009); Marine Contractors Co., Inc. v. Hurley, 365 Mass. at 287; see Kroeger v. Stop & Shop Companies, 13 Mass.App.Ct. 310, 316 (1982), citing Angier v. Webber, 14 Allen 211, 215 (1867). Good will is generated by repeat business with existing customers or by referrals to potential customers. North Am. Expositions Co., Ltd. P’ship, 452 Mass at 870. A former employee with close association and relationships with an employer’s customers is in a position to harm the employer’s good will because the close relationship with the employer’s customers may cause those customers to associate the former employee, and not the employer, with the product and services delivered to the customer through the efforts of the former employee. All Stainless, Inc., 364 Mass. at 779-80. A covenant not to compete solely designed to protect an employer from ordinary *592 competition does not serve a legitimate business interest and is not enforceable. Marine Contractors Co., Inc., 365 Mass. at 287-88; Richmond Bros., Inc. v. Westinghouse Broadcasting Co., Inc., 357 Mass. 106 (1970).
While an employee may use general skill and knowledge acquired during his career, as well as during the course of his particular employment, where an employee is bound by a non-competition and non-disclosure agreement, such employee may not use trade secrets or confidential information to compete against his former employer. Massachusetts courts have been willing to enforce covenants not to compete to protect against inevitable, even inadvertent, disclosure, particularly in the technology industries. See Aspect v. Software, Inc., 787 F.Sup.2d 118, 130 (D.Mass. 2011); Lombard Med’l Tech., Inc. v. Johannessen, 729 F.Supp.2d 432, 442 (D.Mass. 2010); Boulanger, 442 Mass. at 579, n. 12; EMC Corp. v. Breen, 2013 WL1907460, *7, *8 (2013); Empirix, Inc. v. Ivanov, 28 Mass.L.Rptr. 511 *4 (2011); LifeImage, Inc. v. Brown, 29 Mass.L.Rptr. 427 *7 (2005); Cereva Networks, Inc. v. Lieto, 13 Mass.L.Rptr. 694 *5-6 (2001); EMC Corp. v. Allen, 1997 WL 1366836 (1997).
SimpliVity has demonstrated a substantial likelihood that it will succeed on the merits of its claims to enforce the Agreement and for breach of contract. SimpliVity, a start-up company in the highly competitive industry of IT data storage, required Moran as a condition of employment to sign the Agreement, containing non-competition, non-solicitation, and non-disclosure covenants, to protect its confidential information and the good will it was developing with customers and potential customers in the market with its new product. Moran, a sophisticated businessman who recognized and acknowledged the highly competitive nature of SimpliViiy’s business and the industry, agreed to be bound by the Agreement as a condition of his employment with this new start-up company. Moran signed the Agreement at the start of his employment with SimpliVily, and the Agreement was supported by adequate consideration. SimpliVily employed him and paid him compensation, and Moran acknowledged when he signed the Agreement that his agreement to be bound by the restrictive covenants in the Agreement was “a material part of the consideration of [his] employment and continued employment by” SimpliVity. Contrary to Moran’s argument, Moran’s promotions and expansion of his sales territory did not constitute material changes in the employment relationship such that Moran and SimpliVily entered into a new employment relationship. See F.A. Bartlett TreeExpertCo. v. Barrington, 353 Mass. 585, 587 (1968); Iron Mountain Information Management v. Taddeo, 455 F.Sup.2d 124, 132-33 (2006). The promotions and opportunity to make more sales and earn more commissions provided additional consideration for the restrictive covenants in the Agreement. Moreover, the Agreement explicitly provided and Moran agreed that thenon-solic-itation and non-competition restrictions “shall continue in full force and effect even if I am promoted and/or the title of my position at the company changes.”
SimpliVity is likely to succeed in proving that Moran breached the Agreement. Undisputedly, immediately after he resigned from his employment with SimpliVily, Moran began working for Nutanix as an employee, specifically as Area Director, Central United States Sales, which constitutes acting “in any capacity” under the Agreement. It is also undisputed that Nutanix is a direct and primary competitor with SimpliVily, and thus is a “Competing Business” as defined in the Agreement: a “commercial activity which competes or is reasonably likely to compete with any business that the Company conducts, or demonstrably anticipates conducting, at any time during” Moran’s employment. As Area Director, Central United States Sales, for Nutanix, Moran is responsible for managing Nutanix’s Midwest sale territory, which is the same territory he covered when employed by SimpliVily. Therefore, SimpliVity has shown that Moran violated his agreement not to directly or indirectly “act in any capacity” for a Competing Business for the period of one year immediately following termination of his employment with SimpliVity.
SimpliVity has also shown that the Agreement is likely to be valid and enforceable against Moran. The restrictive covenants not to compete, to solicit or disclose, contained in the Agreement, are necessary to protect SimpliVity’s legitimate business interests in its confidential information and good will. Moran acknowledged and agreed that in performing his work for SimpliVity, he would learn and use SimpliVity’s Proprietary Information, including Assigned Inventions and all other business, technical and financial information, including the identity of and information concerning its employees, Affiliates and Business Partners. He acknowledged that secrecy of such information is of the utmost importance. Having agreed to be bound by these restrictive covenants, Moran was allowed access to SimpliViiy’s confidential information, which he used in developing business for SimpliVity and selling its products and services.
Moran argues that SimpliViiy’s customers, business partners, and information about the SimpliVity products is not confidential, but rather is disclosed and widely known in the industry. While the identity of some of SimpliVity’s customers may be known and some information revealed about its products, Moran ignores the fact that he learned and used more than just the identity of existing customers and publicly disclosed information. Involved in many of SimpliVity’s key accounts, he learned not only the identity of existing customers, but also competitively sensitive business information developed and used by SimpliVity for specific ongoing customer relationships, including knowledge of individual customer’s use of SimpliVity products and information. He also learned of prospective customers being targeted by SimpliVily.
Moran began working at SimpliVily after it had recently entered the market with its new products. As Director of Sales, Moran was responsible for creating market strategy, promoting brand awareness of *593 SimpliVity’s products to its customers and partners, developing business and creating opportunities for SimpliVity, overseeing sales pipeline information and sales forecasting, and devising strategies on SimpliVity’s pricing, product messaging, partner strategy and sales acquisition. He reported to and worked closely with SimpliVity’s Vice President of Sales and was frequently involved in high-level discussions regarding SimpliVity strategy, objectives and operations related to sales of SimpliVity’s products with SimpliVity’s key executives, including the CEO, VP Marketing, VP Worldwide Sales, VP Sales Americas, Worldwide VP Alliance, VP Customer Support, and Worldwide Director of Sales Operations. Moran participated in developing the direction of SimpliVity by providing strategic input on key operational and sales strategies, such as product direction, channel development, product messaging, sales growth, and planning. Moran thus learned confidential and commercially sensitive information about SimpliVity’s business, customers, employees and its long-term strategic plans. He was entrusted with information concerning SimpliVity’s confidential business plans, customer and partner lists, competitive intelligence briefs, marketing strategies, product development, product offerings, pricing structures, solicitation methods and training protocols.
Significantly, after interviewing with Nutanix and while he was planning to leave SimpliVity for Nutanix, Moran participated in discussions regarding positioning SimpliVily products against Nutanix products and strategies for competing against Nutanix. During this period when he was planning to leave for Nutanix, Moran was also researching and downloading Salesforce reports, which tracks current customers of SimpliVily, as well as sales leads and other sales-force information. Moreover, despite his assurances that he had returned all Proprietary Information when he left SimpliVily, while working for a month at Nutanix, Moran still had in his possession confidential documents, including a document marked “SimpliVity Confidential and Proprietary,” discussing the SimpliVily sales process; a SimpliVity product evaluation agreement with a customer; a sales pipeline report identifying sales opportunities, next steps, deal value, and other relevant data for specific sales opportunities; and reports of specific customer meetings, labeled “Confidential Information—Do Not Distribute.”
Protecting the confidentiality of such information is essential for a start-up company, like SimpliVity, launching innovative products, to be able to compete in the market against larger, more established companies, like EMC, Hewlett Packard, and Dell, as well as other start-up companies, like Nutanix, which offers similar, new converged IT infrastructure products. The inside information regarding marketing, operational, sales and competitive strategies, plans for product and business development, and SimpliVity’s customers and potential customers, which was shared with Moran and which he participated in developing, constitutes confidential information, which SimpliVily has a legitimate business interest in protecting. Only by prohibiting employees,' like Moran, who are privy to confidential and proprietary information, from going to work for a direct competitor for a period of time, can SimpliVity protect its confidential information. Despite Moran’s protestations that he will not use or share an proprietary information when working for Nutanix, given the nature of the confidential information Moran learned at SimpliVily, the court finds that it is inevitable that Moran will use the information he learned at SimpliVity to compete with SimpliVily on behalf of Nutanix. See Aspect, 787 F.Sup.2d at 130; Lombard Med’l Tech., Inc., 729 F.Sup.2d at 442; Boulanger, 442 Mass. at 579, n.12; EMC Corp. v. Breen, 2013 WL 1907460, *7, *8 (2013); Empirix, Inc. v. Ivanoy, 28 Mass.L.Rptr. 511 4 (2011); EMC Corp. v. Allen, 1997 WL 1366836 (1997).
Furthermore, as Moran acknowledged in signing the Agreement, his position required him to establish goodwill with Business Partners and employees on behalf of the Company and “such goodwill is extremely important to the Company’s success.” In working for SimpliVily, Moran was responsible for developing business for this new start-up company and selling its innovative products. Although Moran had worked in the IT data storage industry for ten years and developed a network of relationships with IT professionals, SimpliVily was launching new converged IT infrastructure and software defined data center products, with which Moran had not had experience. Thus, while he used his existing relationships to sell SimpliVity’s products, for the fourteen months he worked for SimpliViiy, he was developing SimpliVity’s goodwill with new customers, potential customers and the market, using the confidential information about SimpliVity’s products and services which he gained through his employment with SimpliVily. The non-competition provision, as well an the non-solicitation and non-disclosure provisions, in the Agreement are necessary to protect SimpliVity’s legitimate interest in protecting its goodwill.
The restrictive covenants in the Agreement are also reasonable in geographic and temporal scope. Because SimpliVity’s business and the market for its products is worldwide, the covenants prohibiting Moran from working for a direct competitor, like Nutanix, and from soliciting SimpliVity’s employees, customers and potential customers anywhere in the world is reasonable. Further, a period of one year is a reasonable time to restrict such activity by Moran in order to adequately protect SimpliVity’s confidential information and good will.
II. Likelihood of Irreparable Harm, Balance of Harms, and Public Interest
SimpliVily has also demonstrated that enforcement of the non-compete provisions of the Agreement is necessary to prevent it from suffering irreparable harm. Simpli- *594 Vity is likely to suffer harm if Moran is permitted to ■ work for Nutanix selling Nutanix products, in direct competition with SimpliVily, using the substantial confidential information Moran learned while working for SimpliVity. With the benefit of SimpliVily’s confidential information, including its marketing and sales strategies and plans and customer information, as well as its strategies to compete against Nutanix, Moran and Nutanix will be more effectively able to compete with SimpliVily in. the highly competitive, market for its products. SimpliVily will likely suffer loss of business and its good will in this competitive industry. The harm that SimpliVily will suffer by the use of its confidential information by a direct competitor, Nutanix, and its loss of good will is not easily measured and would therefore be irreparable.
Moran argues that the injunction is not necessary to prevent SimpliVily from suffering irreparable harm because Moran has agreed with Nutanix that he will not solicit or do business with any of SimpliViiy’s customers that he worked with while at SimpliVily, and that he will not use or disclose SimpliVity proprietary information. While Moran promises not to solicit SimpliVity customers he worked with, however, he makes no promises regarding potential customers and business he learned about while at SimpliVity or regarding solicitation of Business Partners. Moreover, as discussed above, even with his best efforts, Moran will inevitably use the SimpliVity confidential information in his brain and memory in selling Nutanix’s products and competing against SimpliVily.
Moran asserts that the harm he will suffer outweighs any likelihood of harm to SimpliVity because he will not be able to work in the data storage industry for one year, which will cause a hardship to his family. While the court recognizes that Moran may suffer some financial hardship by enforcement of the injunction, Moran is not restricted from working and using the sales skills he has developed in employment that is not in direct competition with SimpliVity. Moran knew when he went to work for SimpliVity that the data storage industry was highly competitive, that he was going to work for a start up company launching an innovative product, and that maintaining confidentiality of the confidential business information of SimpliVity was necessary for its success in such a market. He agreed to the terms of the Agreement to obtain the benefit of working for such a promising new business, and he also assumed the risks. He acknowledged in the Agreement that his breach of the Agreement would cause irreparable harm to SimpliVity and that SimpliVity would be entitled to injunctive relief. Simply because his employment with SimpliVity did not prove to be as lucrative as quickly as he expected, Moran should not be permitted to take all the confidential information he obtained at SimpliVity and immediately work for the other start-up in the industry, which is SimpliVity’s direct and primary competitor. The court finds that the irreparable harm that SimpliVity will likely suffer if the agreement is not enforced outweighs any risk of harm to Moran.
Finally, enforcement of the Agreement furthers the public interest and Massachusetts public policy supporting the enforcement of reasonable non-compete agreements necessary to protect legitimate business interests.
ORDER
Accordingly, for the foregoing reasons, SimpliVily’s Emergency Motion for a Preliminary Injunction is ALLOWED and it ORDERED as follows.
1. Moran is ordered to cease his employment with Nutanix and is enjoined from being employed by or performing services for Nutanix for one year from the date his employment ended (i.e., the period from June 13, 2014 through June 12, 2015).
2. Moran is enjoined from using or disclosing SimpliVify’s Proprietary information, as defined in the Proprietary Information and Inventions Agreement, dated April 29, 2013.
3. Moran is ordered to immediately identify and return all SimpliVity Proprietary Information, as defined in the Proprietary Information and Inventions Agreement, dated April 29, 2013, or copies thereof in his possession, custody or control.
4. Moran is ordered to immediately make available to SimpliVily the USB devices, which he connected to his SimpliVity laptop computer, for SimpliVily’s inspection, review and removal of SimpliVifys Proprietary Information.
5. Moran is ordered to identify the physical and/or electronic locations where all SimpliVity Proprietary Information controlled by Moran resided following his resignation from SimpliVity (including recipients of SimpliVity Proprietary Information and date of transmittal).
6. Moran is ordered to verify that (i) all SimpliVity Proprietary Information has been returned to Simpli-Vity; (ii) no Proprietary Information has been retained by Moran; and (iii) no SimpliVity Proprietary Information in Moran’s possession, custody or control has been deleted or destroyed; and
7. If any SimpliVity Proprietary Information in Moran’s possession, custody or control has been deleted or destroyed on or after June 13, 2014, Moran is ordered to produce a log to SimpliVity describing each deleted or destroyed item.

 In its verified complaint, SimpliVity has alleged claims against Moran for breach of contract, breach of the covenant of good faith and fair dealing, misappropriation of confidential information and trade secrets, and misappropriation of trade secrets in violation of G.L.c. 93, §§42 and 42A. SimpliVity seeks damages and injunctive relief.

 See http: //www.simplivity.com/news-press/simplivity-launches-omnicube;http: //www.forbes.com/sites/peterco han/20 13/11/ 18/simplivity-revenue-growing-5-fold.